[No. A113168. First Dist., Div. Four. Sept. 25, 2007.]

CAPITOL PEOPLE FIRST et al., Plaintiffs and Appellants, v.
STATE DEPARTMENT OF DEVELOPMENTAL SERVICES et al.,
Defendants and Respondents;
CALIFORNIA ASSOCIATION OF STATE HOSPITAL/PARENT
COUNCILS FOR THE RETARDED et al., Interveners and Respondents.

678

## COUNSEL

Protection & Advocacy, Inc., Ellen S. Goldblatt, Eric R. Gelber, Dara L. Schur, Margaret Roberts, Sujatha Jagadeesh Branch; Bingham McCutchen, Michael T. Pyle, Christina M. Wheeler, Christopher M. O'Connor; DLA Piper Rudnick Gray Cary, Michael Tracy, Amy Wallace Potter and Jarod M. Bona for Plaintiffs and Appellants.

Brad Seligman and Julia Campins for The Impact Fund, American Civil Liberties Union of Northern California, Asian Pacific American Legal Center, Equal Rights Advocates, Inc., Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Mexican American Legal Defense and Educational Fund, Public Advocates, Inc., and Western Center on Law and Poverty as Amici Curiae on behalf of Plaintiffs and Appellants.

Law Foundation of Silicon Valley, Public Interest Law Firm, Kyra Kazantzis and James F. Zahradka for the Washington Protection and Advocacy System, National Disability Rights Network, Mental Health Advocacy Project and Public Interest Law Firm of the Law Foundation of Silicon Valley and Disability Rights Education and Defense Fund as Amici Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Douglas Press and Susan M. Carson, Deputy Attorneys General; Erickson, Beasley, Hewitt & Wilson, Henry S. Hewitt and Todd Boley for Defendant and Respondent Department of Developmental Services.

Lewis, Brisbois, Bisgaard & Smith, Duane C. Musfelt and Pamela M. Ferguson for Defendant and Respondent San Diego-Imperial Counties Developmental Services, Inc.

Reed Smith, Bette B. Epstein, Lisa C. Hamasaki and Hannah M. Shafsky for Defendants and Respondents Alta California Regional Center, Far Northern Regional Center, North Bay Regional Center, Regional Center of the East Bay and San Andreas Regional Center.

Woodruff, Spradlin & Smart and M. Lois Bobak for Defendant and Respondent Regional Center of Orange County.

Farella Braun & Martel; Mark D. Peterson and Patrick R. McKinney for Interveners and Respondents.

## OPINION

**REARDON, Acting P. J.**—Nearly 15 years after passage of the landmark Lanterman Developmental Disabilities Services Act (Lanterman Act),[1] a group of persons with developmental disabilities sued the state Department of Developmental Services (Department) and other defendants to secure their entitlement to community living arrangements under the Lanterman Act. (*Coffelt v. Department of Developmental Services* (Super. Ct. S.F. City and County, 1994, No. 916401) (*Coffelt*).) In 1994, *Coffelt* was resolved with a stipulated class action settlement.

The current lawsuit[2] is the second major suit prosecuted to enforce the right of persons with developmental disabilities to live in the least restrictive environment commensurate with their needs, thereby avoiding unnecessary institutionalization. The focus is on the systemic failure of the state agencies and regional centers to provide proper oversight and enforce constitutional, statutory and regulatory mandates to place individuals in less restrictive community settings when appropriate. Only injunctive and declaratory relief is sought. Cognizant that individualized outcomes were not being sought, the trial court nonetheless concluded that proof would focus on the individual circumstances of class members. Denying class certification, the court determined that appellants demonstrated ascertainability, numerosity, typicality and adequacy of counsel but failed to establish commonality, adequacy of class representation and superiority. As we explain, the court based its decision on improper criteria and erroneous legal assumptions. Accordingly, we reverse the judgment.

---

[1] Welfare and Institutions Code section 4500 et seq. All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Plaintiffs and appellants are 16 representative plaintiffs, two taxpayer plaintiffs and three organizational plaintiffs. State defendants and respondents are the Department and its director, sued in his official capacity; the California Health and Human Services Agency and its secretary, sued in her official capacity; the Department of Health Services and its director, sued in her official capacity; the Department of Finance and its acting director, sued in his official capacity; and the state Department of Mental Health. Regional center defendants and respondents are the 21 regional centers in this state.

## I. Background

### A. *Overview of Legal Framework*

Enacted in 1977, the Lanterman Act establishes a comprehensive scheme for providing services to people with developmental disabilities.[3] The stated policy of the legislation is to establish "[a]n array of services and supports . . . which is sufficiently complete to meet the needs and choices of each person with developmental disabilities, regardless of age or degree of disability, and at each stage of life and to support their integration into the mainstream life of the community. To the maximum extent feasible, services and supports should be available throughout the state to prevent the dislocation of persons with developmental disabilities from their home communities. [¶] Services and supports should be available to enable persons with developmental disabilities to approximate the pattern of everyday living available to people without disabilities of the same age." (§ 4501.)

The Lanterman Act enumerates legal rights of persons with developmental disabilities. (§ 4502.) These include the "right to treatment and habilitation services and supports in the least restrictive environment" and the "right to dignity, privacy, and humane care," with treatment, services and supports provided in natural community settings to the maximum extent possible. (§ 4502, subds. (a), (b).) As our Supreme Court stated in *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 391 [211 Cal.Rptr. 758, 696 P.2d 150]: "[T]he Act defines a basic right and a corresponding basic obligation: the right which it grants to the developmentally disabled person is to be provided with services that enable him to live a more independent and productive life in the community; the obligation which it imposes on the state is to provide such services."

A network of 21 regional centers[4] is responsible for determining eligibility, assessing needs and coordinating and delivering direct services to individuals

---

[3] The term "developmental disability" refers to "a disability that originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual. . . . [T]his term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation, but shall not include other handicapping conditions that are solely physical in nature." (§ 4512, subd. (a).)

Nearly one-third of the developmentally disabled persons served in California have a diagnosis of two or more disabilities and approximately 10 percent are dually diagnosed with both a developmental disability and a mental health condition.

[4] The Department contracts with private nonprofit corporations to establish and operate regional centers. The nonprofit corporations must meet governing board criteria that ensure a diverse and representative membership knowledgeable of, or interested in, developmental disabilities. (§§ 4621, 4622.)

with developmental disabilities and their families within a defined geographical area. (§ 4620 et seq.) Designed on a service coordination model, the purpose of the regional centers is to "assist persons with developmental disabilities and their families in securing those services and supports which maximize opportunities and choices for living, working, learning, and recreating in the community." (§ 4640.7, subd. (a).) The Department allocates funds to the centers for operations and the purchasing of services, including funding to purchase community-based services and supports. (§§ 4620, 4621, 4787.)

The Department is the designated state agency with "jurisdiction over the execution of the laws relating to the care, custody, and treatment of developmentally disabled persons . . . ." (§ 4416.) Accordingly, it is charged with (1) monitoring the regional centers to ensure that they comply with federal and state law, and (2) taking action to support the centers in achieving compliance and in providing "high quality services and supports to consumers[5] and their families." (§§ 4434, subds. (a), (b), 4500.5, subd. (d), 4501.)

The specific rights of persons with developmental disabilities and the corresponding obligations of the state are determined through an individual program plan (IPP) procedure that meets common statutory requirements. (§§ 4646–4648.) The IPP is developed by a planning team that includes the consumer, his or her legally authorized representative, and one or more regional center representatives. (§ 4512, subd. (j).) The goals and objectives developed through the IPP process should maximize opportunities for the individual to be part of community life; enjoy increased control over his or her life; acquire positive roles in community life; and develop the skills to accomplish the same. (§ 4646.5, subd. (a)(2).) In securing services to implement the IPP, the highest preference is afforded services and supports that allow minors to live with their families and adults to live as independently as possible in the community. (§ 4648, subd. (a)(1), (2).)

The Department directly operates seven public institutions (developmental centers) which house approximately 3,000 of the state's more than 200,000 persons with developmental disabilities. (See §§ 4440, 4440.5.) Approximately 4,600 persons live in other institutions.

B. *Community Placement Plan*

The Lanterman Act includes provisions to create and implement a community placement plan (CPP) process designed to move individuals with developmental disabilities from the developmental centers to the community.

---

[5] "Consumer" is defined as "a person who has a disability that meets the definition of developmental disability . . . ." (§ 4512, subd. (d).)

(§ 4418.25.) The Department is responsible for establishing policies and procedures for development of annual CPP's by each regional center and allocates funds for implementation. (§ 4418.25, subds. (a), (d).) Under the CPP mandate the regional centers must identify consumers for possible transition to community living arrangements, coordinate with the developmental centers and other entities on an IPP process to ensure a successful transition, and develop a supporting budget to accomplish the goal. (§§ 4418.25, 4418.3.) The CPP provides for dedicated funding for regional centers to move selected persons from developmental centers to the community, and to prevent developmental center placement in the first instance. (§ 4418.25, subds. (b), (d).)

## C. *Agnews Closure Plan*

In 2005, the Department submitted a plan to the Legislature calling for the closure of Agnews Developmental Center (Agnews) by June 30, 2007. The Bay Area regional centers collaborated in this effort by engaging in the individualized planning and resource development and other activities authorized in their CPP pursuant to section 4418.25. The Agnews closure plan proposes "an enhanced community service delivery system in the Bay Area that can meet the needs of the majority of Agnews' residents." To that end the plan provides for development of new resources and innovative programs, including a sustainable increase in appropriate housing.

## D. Coffelt

In 1991, the *Coffelt* class action was brought against the Department and others challenging the state's implementation of the Lanterman Act on many fronts. The parties stipulated to a class action settlement in 1994. The settlement included certification of a settlement class comprised of developmental center residents recommended for community placement, and required systemic reforms as well as a net reduction in 2,000 persons in the developmental center population over a five-year period.

During the settlement period, the developmental center population declined by more than the targeted amount, but thereafter movement of individuals from these institutions to the community settings slowed considerably. In the words of a Department employee: "[A]fter the *Coffelt* settlement agreement was over, the pressure was off. . . ."

## E. *The Present Litigation*

Appellants filed suit in January 2002. The fifth amended complaint is the operative pleading, filed in July 2005. The proposed class is defined as

follows: "All California residents with a developmental disability, as defined in . . . section 4512(b), who are (or become) institutionalized,[6] and those who are at risk[7] of being institutionalized, in congregate residential facilities having a capacity of 16 or more individuals."

The preamble to the fifth amended complaint sets forth the nature of the controversy permeating the nine causes of action:[8] "Thousands of Californians with developmental disabilities are needlessly isolated and segregated from mainstream society in large congregate public and private institutions. Every year hundreds more find themselves at risk of institutionalization due to the lack of appropriate community supports and crisis intervention. Plaintiffs bring this lawsuit to restore their legal rights to freedom from such institutionalization and to live, with appropriate supports, in our neighborhoods. [¶] The current circumstances violate [f]ederal and [s]tate law. In the [Lanterman Act] . . . California created an entitlement for people with developmental disabilities to an array of services and supports sufficiently complete to meet their needs and choices, to support their integration into the mainstream life of the community and to enable them to approximate the pattern of everyday living available to people without disabilities. . . . Despite this mandate, thousands of people with developmental disabilities are unnecessarily institutionalized because the [s]tate and the regional centers have failed in their obligation under the Lanterman Act to develop and provide community-based alternatives."

The preamble goes on to introduce the ADA and the holdings in *Olmstead v. L.C.* (1999) 527 U.S. 581, 600 [144 L.Ed.2d 540, 119 S.Ct. 2176], that (1) "unjustified institutional isolation of persons with disabilities is a form of

---

[6] Under this definition, the term "institutions" refers to public, licensed or certified facilities, including developmental centers, as well as an array of other public and private facilities with a capacity of 16 or more persons.

[7] A person is "at risk" of being institutionalized when "the regional center determines, or is informed by the consumer's parents, legal guardian, conservator, or authorized representative that the community placement of [the] consumer is at risk of failing, and that admittance to a state developmental center is a likelihood . . . ." (§ 4418.7, subd. (a).) As well, for purposes of the class definition, persons at risk of institutionalization also include those meeting the same criteria with respect to nondevelopmental center institutions. Finally, the class definition encompasses individuals who are released from a developmental center for provisional placement for one year, as these individuals have an "automatic right of return" to the developmental center during that period. (§ 4508.)

[8] The causes of action are: (1) violation of Lanterman Act entitlement to noninstitutional community living arrangements based on individual need; (2) deprivation of rights under state nondiscrimination laws (Gov. Code, § 11135; Welf. & Inst. Code, § 4502); (3) deprivation of rights under the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.); (4) violation of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 et seq.); (5) violation of state constitutional rights; (6) violation of federal constitutional rights; (7) violation of the Medicaid Act (42 U.S.C. § 1396 et seq.); (8) unlawful and unfair business practices against regional center defendants; and (9) illegal expenditure of taxpayer money.

discrimination"; and (2) states are required to provide community-based treatment when, among other factors, the placement can be reasonably accommodated (*id.* at p. 607). Continuing, the preamble states: "[I]n violation of the ADA, California has failed to take adequate steps to reduce the unnecessary institutionalization of people with developmental disabilities at a reasonable pace. [¶] Unnecessary segregation also contravenes other [s]tate and [f]ederal statutory rights as well as fundamental constitutional rights, including the rights to liberty, privacy and freedom of association. [¶] In spite of these rights and obligations, state and regional center defendants do not do adequate assessments of individuals' ability to benefit from community living, do not do adequate program planning, and therefore, do not develop sufficient quality programs to meet the needs of people with developmental disabilities. Because of defendants' policies and practices, and because California continues to under-fund its community service system, there is a continuing shortage of stable, quality community living arrangements and ancillary supports that would enable people with developmental disabilities to achieve their potential for independence and integration into the community. The further and inevitable result of defendants' conduct is the continued unnecessary institutionalization of thousands of people with developmental disabilities."

Appellants requested declaratory and injunctive relief as well as orders pursuant to a writ of mandate compelling defendants to comply with enumerated duties.

### F. *Appellants' Evidence and Claims*

According to appellants' evidence, respondents have acknowledged that the vast majority of class members could live in less restrictive settings with appropriate supports and services. One Department official indicated "it is possible to serve the majority of people in the community if the appropriate resources are there and if the capacity of the community exists as a general principle." When queried about the percentage of people in developmental centers who could live in the community with appropriate supports and services, another Department official responded "100 percent" and agreed that people with the most significant support challenges can be served in noninstitutional settings. One regional center director stated his belief that "everyone who is in the developmental center can be served in a community setting." Another testified that "all of the approximately 125 people that reside at the developmental center from the [catchment] area are capable of living in the community successfully."

Appellants point to the Agnews closure plan as a model demonstrating the feasibility of moving a substantial majority of developmental center residents

to less restrictive community placements. The populations served by other developmental centers are similar, yet no plans are afoot to close or otherwise transition large portions of the residents of those institutions to community settings. Thus, according to appellants, except for the Agnews closure plan, the CPP's, as implemented by regional centers and the Department, are "woefully inadequate" in meeting the least restrictive environment mandate of the Lanterman Act and other laws.

And, although the Department is responsible for establishing policies and procedures for the annual CPP's developed by the regional centers, it has not developed "a priori standards as such" for determining whether CPP placement goals are adequate. The Department has never directed a regional center to raise its placement goal, but it has requested that a center lower its goal.

The Department has developed an incentive system whereby operational dollars will be withheld proportionally from a regional center if it does not meet its placement goals. In fact, this system can work as an incentive for regional centers to seek *fewer* placements than possible in order to avoid penalties for trying harder. At least one regional center penalized under this system subsequently reduced the number of placements in its CPP by half to avoid a future penalty. The CPP manager for that center called the allocation system "very troubling."

Lyn Rucker, with decades of national as well as international experience working with government agencies and the courts to develop and implement systems that promote community services for individuals with developmental disabilities, declared that under the CPP process "except for residents of [Agnews], the majority of developmental center residents will have to wait for decades for an opportunity to live in the community at the pace currently being achieved in California." As an example, Sonoma Developmental Center is the largest developmental center with a population of 754 as of August 31, 2005. This institution averages 20 community placements a year. Nonetheless, Sonoma Developmental Center serves a population of persons with developmental disabilities that are no more severe than those in Agnews, where 85 percent of residents will move to the community under the closure plan.

In addition to residents of developmental centers, another 4,462 persons live in other congregate institutions. Although the CPP applies only to those residing in developmental centers or who are at risk of developmental center placement, the CPP "is not intended to limit the department's or regional centers' responsibility to otherwise conduct assessments and individualized program planning, and to provide needed services and supports in the least restrictive, most integrated setting in accord with the [Lanterman Act]."

(§ 4418.25, subd. (b).) Nevertheless, there is no policy or planning process comparable to the CPP process for reducing the number of consumers living in large nondevelopmental center congregate institutions. Moreover, the Department does not require regional centers to have a plan for deflecting people for admission to these facilities.

### G. *Motions to Intervene and for Class Certification*

Early in the litigation, 10 developmental center residents who wished to remain in institutions and two organizations representing parents, conservators and friends of developmental center residents moved to intervene.[9] Interveners argued that the interests of plaintiffs were hostile to their interests, plaintiffs were not adequate representatives, and the relief they sought would impair the rights of those persons whose needs are best met in a developmental center. Granting leave to intervene, the court limited the complaint in intervention to ensuring "that the legal rights of parents and guardians to participate in the planning process and the ability of professionals to recommend placement in development centers are not adversely affected by any judgment in this action."

Appellants filed the motion for class certification that is the subject of this appeal in September 2005. The trial court denied the motion, concluding that (1) appellants could not satisfy the element of commonality because the issues dictated a concentration on the individualized circumstances of class members; (2) appellants had not demonstrated that they would adequately represent the interests of all putative class members or that the interests of interveners would be protected adequately by their presence in the litigation; and (3) the wrongs asserted could not readily be cured on a classwide basis, but the hearing procedure under section 4700 et seq. would be effective for redress of individual grievances. This appeal followed.

### II. Discussion

### A. *Certification Requirements; Standard of Review*

■ Code of Civil Procedure section 382 permits class actions "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." The certification question does not inquire whether the action is factually or legally meritorious. Rather, the proponent of certification must

---

[9] The organizations are California Association of State Hospital/Parent Councils for the Retarded (CASH/PCR) and California Association for the Retarded (CAR). CASH/PCR claims that of the approximately 3,120 residents in the developmental centers, nearly half have a family member, friend or conservator who is affiliated with the organization.

establish the existence of a well-defined community of interest among class members. (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1104 [131 Cal.Rptr.2d 1, 63 P.3d 913].) The community of interest requirement embraces three factors: (1) common questions of law or fact that predominate over questions affecting individual members; (2) class representatives with claims or defenses that are typical of the class; and (3) class representatives who can adequately represent the class. (*Ibid.*)

■ As well, in assessing the appropriateness of certification trial courts are charged with carefully weighing the respective benefits and burdens of class litigation to the end that maintenance of the class action will only be permitted where substantial benefits accrue to the litigants and the court. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27].) This obligation entails considering the role of the class action mechanism in deterring and redressing wrongdoing. (*Id.* at pp. 445–446.) Further, the substantial benefits analysis raises the question whether a class action is superior to individual lawsuits and other alternative procedures for resolving the controversy. (*Basurco v. 21st Century Ins. Co.* (2003) 108 Cal.App.4th 110, 120–121 [133 Cal.Rptr.2d 367]; *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 660–661 [22 Cal.Rptr.2d 419].)

Trial courts have wide discretion with regard to class certification. Thus we will not overturn the lower court's certification decision which is supported by substantial evidence unless it (1) used improper criteria; or (2) made erroneous legal assumptions. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23]; *Reese v. Wal-Mart Stores, Inc.* (1999) 73 Cal.App.4th 1225, 1229, 1233 [87 Cal.Rptr.2d 346].) We do not decide in the first instance whether the requested class is appropriate. Rather, our job is to decide whether the trial court abused its discretion in denying certification. (*Reese, supra*, 73 Cal.App.4th at p. 1233.) A certification ruling not supported by substantial evidence will not stand. (*Lockheed Martin Corp. v. Superior Court, supra*, 29 Cal.4th at p. 1106.) By the same token, even if the decision denying certification is supported by substantial evidence, we will reverse if it is based on improper criteria or incorrect assumptions. (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 436.)

B. *Commonality*

1. *Introduction*

■ It is the burden of the proponent of class certification to show, with substantial evidence, that common questions of law or fact predominate over questions affecting individual members. (*Lockheed Martin Corp. v. Superior Court, supra*, 29 Cal.4th at pp. 1104, 1106.) And whether such substantial

evidence exists involves analysis of whether the proponent's "theory of recovery" is likely to prove compatible with class treatment. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327 [17 Cal.Rptr.3d 906, 96 P.3d 194] (*Sav-On*).)

The trial court delivered a ruling on the issue of commonality that was marked by contradictions and inconsistencies. While acknowledging that appellants were seeking only systemic relief, and not individual solutions to individual problems, it nonetheless insisted on defining the claims asserted in the litigation with respect to the "common discrete wrongs[10] that affect individual class members." Thus, instead of focusing on the similar but broader list of common legal and factual questions appellants provided, and the proof offered for the same, the court seized instead on appellants' examples of typicality to define discrete wrongs common to each individual which it concluded demanded individualized inquiries.

Compounding this error, the trial court filtered the analysis and considerations required to address these issues solely through the lens of the individual and his or her IPP, rather than taking a broader, systemic view concentrating on respondents' policies and practices. Upon undertaking its examination of discrete wrongs, the court concluded that common issues of fact would not predominate because the deficiencies, variables and pertinent lines of inquiry would be individualized. Respondents cling to this single-minded approach on appeal.

Additionally, in choosing to focus on discrete wrongs, the court relied substantially on *J.B. ex rel. Hart v. Valdez* (10th Cir. 1999) 186 F.3d 1280, 1289[11] with its refusal "to read an allegation of systematic failures as a

---

[10] These wrongs, as set out by the court, were (1) failure to provide understandable information in the IPP process; (2) failure to provide adequate assessments in the IPP process; (3) basing IPP recommendations on factors unrelated to the needs and choices of the individuals concerned; (4) failure to provide timely services and supports; and (5) failure to provide adequate community resources.

[11] There, plaintiffs pursued a theory of systemic failure in their effort to structurally reform New Mexico's system for evaluating and treating children with developmental and mental disabilities who were in the state's custody. Parting ways with the Third Circuit's decision in a similar case (*Baby Neal for and by Kanter v. Casey* (3d Cir. 1994) 43 F.3d 48 (*Baby Neal*)), the court upheld the refusal to certify a class because there was no single constitutional or statutory claim common to the named plaintiffs and putative class members. (*J.B. ex rel. Hart v. Valdez, supra*, 186 F.3d at pp. 1288–1289.)

*Baby Neal* was a federal class action in which the named plaintiffs sought declaratory and injunctive relief against officials responsible for operating Philadelphia's child welfare system. Numerous federal and state statutory and constitutional violations were alleged. The district court denied class certification under rule 23(b)(2) of the Federal Rules of Civil Procedure (28 U.S.C.) (hereafter rule 23(b)(2)) because each plaintiff was faced with his or her individual circumstances and needs and thus the class could not complain about a single common injury (*Baby*

moniker for meeting the class action requirements. . . . For a common question of law to exist, the putative class must share a discrete legal question of some kind." Nevertheless, the court also acknowledged that under California law, courts can take an aggregate approach to plaintiffs' claims. Specifically, the court itself noted that in *Sav-On, supra,* 34 Cal.4th at page 324, the Supreme Court did not separately analyze various statutory and common law claims because all claims focused on whether class members were misclassified as exempt from overtime laws. (See also *Mendoza v. County of Tulare* (1982) 128 Cal.App.3d 403, 407, 417 [180 Cal.Rptr. 347] [rejecting defendants' assertion that plaintiff-prisoners' right to relief based on 10 causes of action alleging numerous state and federal statutory and constitutional violations simply amounted to aggregation of individual claims].)

In an effort to accommodate appellants' theory of the case, the court went on to spell out what it called an "alternate approach" for class claims seeking only injunctive and declaratory relief and centering on whether appellants demonstrated that respondents " 'acted or refused to act on grounds generally applicable to the class.' [(Rule 23(b)(2)).]"[12] (See fn. 11, *ante.*) And, not

*Neal, supra,* 43 F.3d at p. 54). (Rule 23(b)(2) is a route to certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.") Reversing, the circuit court explained that the differences in the factual background of each claim are unlikely to affect the outcome of the legal issue, especially "where plaintiffs request declaratory and injunctive relief against a defendant engaging in a common course of conduct toward them, and there is therefore no need for *individualized* determinations of the propriety of injunctive relief. [Citation.] Indeed, [rule 23](b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." (*Baby Neal, supra,* 43 F.3d at p. 57.) With respect to the matter at hand, the court ruled: "Plaintiffs have alleged that systemic failure causes the DHS to violate various mandates under federal statutory and constitutional provisions. Because the children in the system are comparably subject to the injuries caused by this systemic failure, even if the extent of their individual injuries may be affected by their individual circumstances, the challenge to the system constitutes a legal claim applicable to the class as a whole. An order forcing the DHS to comply with their statutory and constitutional mandates would constitute relief generally applicable to the entire putative class." (*Id.* at p. 64.)

The Ninth Circuit recently relied on *Baby Neal* in a California prisoners' rights case under the ADA, Rehabilitation Act and Fourteenth Amendment, concluding that "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members. [Citations.] In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality. [(See *Baby Neal, supra,* 43 F.3d at p. 56.)] Certainly, the differences that exist here do not justify requiring groups of persons with different disabilities, all of whom suffer similar harm from the Board's failure to accommodate their disabilities, to prosecute separate actions." (*Armstrong v. Davis* (9th Cir. 2001) 275 F.3d 849, 868.)

[12] In the absence of relevant state precedent, trial courts are urged to follow the procedures set forth in rule 23 of the Federal Rules of Civil Procedure for conducting class actions.

surprisingly, it concluded that a different result would occur if the spotlight were on respondents' policies instead of the class members' claims. Nonetheless, and puzzlingly, the court rejected an approach centered on respondents' common policies and practices generally applicable to all putative class members. It reasoned that such a focus would require the trier of fact to pay significant attention to how the policies and practices affect each class member through the development, content and implementation of individual IPP's, and thus the use of sampling or statistical proof would be restricted. We conclude that the trial court ignored or misunderstood the guiding principles of California law on the commonality question and thus based its denial of certification on improper criteria and erroneous legal assumptions.

### 2. Sav-On *Sets the Standard*

*Sav-On* teaches that in resolving whether there is substantial evidence to support the trial court's certification order, "we consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Sav-On, supra*, 34 Cal.4th at p. 327.) As part of this process, we consistently look to the allegations in the complaint and the declarations of attorneys representing the class. (*Ibid.*)

■ *Sav-On* concerned allegations that the drugstore chain misclassified employees as exempt from overtime laws and thus failed to pay overtime compensation owing to the plaintiffs. Despite the defendant's argument that determination of any liability for unpaid overtime compensation depended on making individual computations, the plaintiff produced substantial evidence that the *defendant's policy and practice* was one of deliberate misclassification and that due in part to operational standardization, a uniform classification policy based solely on job descriptions resulted in widespread de facto miscalculation. (*Save-On, supra*, 34 Cal.4th at pp. 328–329.) Overturning the Court of Appeal's denial of class certification, the Supreme Court held that even allowing for individual damage determinations, either of the plaintiffs' theories was amenable to class treatment. (*Id.* at pp. 329–330.) Thus, while calculation of individual damages might be required down the road, this possibility did not foreclose taking common evidence on the misclassification issues. (*Id.* at p. 332.) Moreover, the court emphasized the community of interest requirement for certification *does not mandate that class members have uniform or identical claims*. (*Id.* at p. 338.) Further, in deciding whether the commonality requirement has been satisfied, courts may consider pattern

---

(*Green v. Obledo* (1981) 29 Cal.3d 126, 145–146 [172 Cal.Rptr. 206, 624 P.2d 256].) As we have no specific statutory provision detailing procedures for class plaintiffs pursuing only injunctive and declaratory relief, the trial court appropriately looked to rule 23(b)(2) for guidance.

and practice, statistical and sampling evidence, expert testimony and other indicators of a given defendant's classwide practices in order to assess whether that common behavior toward similarly situated plaintiffs renders class certification appropriate. (*Id.* at p. 333.)

Similarly, in *Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1278–1279 [242 Cal.Rptr. 339],[13] a government benefits case attacking a county's practice of depriving general relief recipients of benefits, the reviewing court explained that the necessity for class members to establish eligibility and damages individually did not mean that individual fact questions predominated. It also rejected the defendant's argument that even if the county had a common duty, proof of whether it actually administered the program in question improperly depended on individual factual determinations. Rather, the propriety of the county's actions could be established by reviewing regulations, testimony of employees, and a sampling of representative cases. (*Ibid.*)

So, too, a community of interest was found in a prisoners' rights case despite the county's assertion that any right to relief depended on facts peculiar to each prisoner's case, thereby amounting "to a mere aggregation of individual claims." (*Mendoza v. County of Tulare, supra*, 128 Cal.App.3d at p. 417.) Instead, to establish a right to a remedy, the plaintiffs could focus on the defendants' actions and omissions. If the trial court ultimately found statutory and/or constitutional violations, declaratory and injunctive relief would redress systemic violations common to the class notwithstanding that some would apply only to individuals. (*Id.* at p. 418.)

### 3. *Appellants Met the Standard*

Here, as in the above cases, appellants' theory of recovery, as gleaned from the pleadings and declarations, focuses on the common practices, policies, acts and omissions of the state actors and regional centers. The overarching theme is that there is a pattern and practice of failure to meet constitutional, statutory and regulatory mandates to provide services and place class members in less restrictive settings, and the systemic effect of this failure is to impinge upon plaintiffs' rights under state and federal law. As stated without ambiguity in their memorandum supporting class certification: "[P]laintiffs are not asking for individual relief for the thousands of members of the class—each of whom, obviously, does have unique needs. Rather, plaintiffs seek to compel those state and local entities responsible for providing, as an 'entitlement,' a ' " pattern of facilities and services . . . sufficiently complete

---

[13] *Reyes* was cited with approval and relied on in *Sav-On, supra*, 34 Cal.4th at pages 333, footnote 6, and 334.

to meet the needs of each person with developmental disabilities, regardless of age or degree of handicap, and at each stage of life" [citation]' to put in place the procedures, practices and infrastructure that will ensure that they carry out these obligations to class members. The systemic relief plaintiffs seek could not be obtained on a case-by-case basis."

In this same memorandum, appellants also detailed the legal and factual issues common to the class. Common legal issues were threefold: (1) Whether respondents' policies and procedures violate the rights of class members under various enumerated state and federal statutes to avoid unnecessary institutionalization and receive services in the least restrictive, most integrated setting consistent with their needs and choices; (2) whether policies and procedures resulting in actual or potential unnecessary institutionalization violate or place at risk class members' constitutional rights; and (3) whether regional centers' violations of these rights also violate Business and Professions Code section 17200. Common factual issues were described this way: (1) Whether respondents "properly conduct individualized assessments by qualified professionals that are sufficiently person-centered and comprehensive to determine the community-based services" necessary to end or prevent unnecessary institutionalization; (2) whether respondents provide or ensure development of such services and options so that class members for whom institutionalization is not necessary actually receive the services to which they are entitled in a timely manner; and (3) whether defendants conduct the oversight and monitoring responsibilities designed to prevent violations of class members' federal and state rights.

We reiterate that these common issues were framed more broadly than the examples appellants offered to illustrate typicality which the court relied on to base its identification and discussion of "discrete alleged wrongs." Appellants' typicality evidence was generated from declarations of plaintiffs and their guardians whereas the commonality evidence was generated from expert testimony and the testimony of respondents' staff.

In support of certification and the underlying assertion that proof of systemic deficits in respondents' policies and practices was amenable to class treatment as required by *Sav-On*, appellants submitted pattern and practice evidence including testimony from respondents about their policies and practices; admissions; documents; statistics; expert testimony; and sampling. They also explained their intended use of statistics and additional sampling for trial. For example, challenging the legal sufficiency of the assessment process, appellants identified as a common factual issue whether respondents used proper standards and criteria for conducting the assessments. They presented expert testimony and deposition testimony from the ranks of respondents' professionals on this point. Further, appellants explained that at

trial experts would show that respondents' policies do not take into account all the appropriate standards, and through sampling a subset of IPP's, this phenomenon would be illustrated. As well, appellants showed that *respondents* used sampling for compliance monitoring and evaluation purposes, including sample IPP reviews.

As another example, for the common factual issue of whether respondents provide or ensure development of community-based services and placement options, appellants likewise presented expert testimony and testimony from the ranks of respondents' professionals on this point. Again, appellants explained that statistical sampling of individual records could be submitted to confirm and corroborate what had been forthcoming through testimony.

Additionally, appellants proffered common evidence in support of their theory of illegality, namely that after the *Coffelt* settlement period ended, the "pressure was off" and respondents lacked the motivation to continue the pace of community placement despite acknowledging that the vast majority of plaintiffs could live in less restrictive settings with appropriate services and supports. The parties' experts dueled on the issue of why there was a decreased pace of community placements after *Coffelt* and whether the present community placement system was sufficient to address the issue of unnecessary institutionalization. However, resolution of this dispute goes to the question of the legality of respondents' behavior, and does not involve the kind of individual factors that erroneously concerned the trial court.

### 4. *The Trial Court Erroneously Discarded Appellants' Theory of Recovery and Rejected Standard Methods of Proof*

Rejecting a focus on respondents' classwide conduct despite the suitability of this approach where only declaratory and injunctive relief is sought to remedy allegedly illegal practices and policies, the court adhered to the misguided assumption that significant individual inquiries would be necessary to provide class relief. By discarding out of hand appellants' pattern and practice evidence, the trial court turned its back on methods of proof commonly allowed in the class action context. Over the years, numerous courts have approved the use of statistics, sampling, policies, administrative practices, anecdotal evidence, deposition testimony and the like to prove classwide behavior on the part of defendants. (*Sav-On, supra*, 34 Cal.4th at p. 333; *Employment Development Dept. v. Superior Court* (1981) 30 Cal.3d 256, 265–266 [178 Cal.Rptr. 612, 636 P.2d 575]; *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 380–381 [19 Cal.Rptr.3d 29] [noting that in employment discrimination class actions, plaintiffs " 'normally seek to establish a pattern or practice of discriminatory intent by combining statistical and nonstatistical evidence, the latter most commonly consisting of anecdotal

evidence of individual instances of discriminatory treatment' "]; *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 750 [9 Cal.Rptr.3d 544] [referring to statistical sampling as "a different method of proof" and "a particular form of expert testimony"]; *Reyes v. Board of Supervisors, supra,* 196 Cal.App.3d at p. 1279; *Stephens v. Montgomery Ward* (1987) 193 Cal.App.3d 411, 421 [238 Cal.Rptr. 602] [commonality requirement satisfied with statistical data and analysis].)

The court's assumption that the individualized nature of each IPP "would restrict the use of sampling or statistical proof at trial" was incorrect. This assumption, if followed to its logical conclusion, would turn all pattern and practice class litigation upside down. It suggests that the trier of fact would have to look at each person's IPP to see if a proper assessment was conducted, proper recommendations were made, appropriate community services were available, etc. Following this flawed logic, if at some critical mass of individual inquiries it appeared that a pattern and practice of deviating from statutory and constitutional promises was emerging, then plaintiffs would have made their case. On the other hand, consistent with California law, appellants' theory of recovery and approach is to reveal the patterns and practices in the first instance, through expert testimony, admissions, statistical proof, documentary evidence and the like, and then support the findings with corroborative, anecdotal evidence and sampling.

■ The court misunderstood the nature of practice and pattern litigation and therefore based its determination that common factual and legal issues did not predominate on improper criteria and erroneous legal assumptions. These errors led the court to prejudge the merits of appellants' case. Either sampling is valid and reliable, or it is not. Either statistical proof is compelling and convincing, or it is not. These inquiries go to the merits—the quantum of proof appellants are able to amass. It is not the trial court's role to become enmeshed with the merits of the underlying action, or to concern itself with which side's experts are more qualified. At the class certification stage, the concern is whether the evidence plaintiffs will offer is "sufficiently generalized in nature." (*In re Cipro Cases I & II* (2004) 121 Cal.App.4th 402, 412–413 [17 Cal.Rptr.3d 1].) Here, appellants *only* proffered evidence that was generalized in nature.

## C. *Adequacy of Representation*

### 1. *Guiding Principles*

■ The adequacy of representation component of the community of interest requirement for class certification comes into play when the party opposing certification brings forth evidence indicating widespread antagonism

to the class suit. " 'The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent.' [Citation.] '. . . To assure "adequate" representation, the class representative's personal claim must not be inconsistent with the claims of other members of the class. [Citation.]' [Citation.]" (*J. P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 212 [6 Cal.Rptr.3d 214].) To resolve the adequacy question the court "will evaluate 'the seriousness and extent of conflicts involved compared to the importance of issues uniting the class; the alternatives to class representation available; the procedures available to limit and prevent unfairness; and any other facts bearing on the fairness with which the absent class member is represented.' [Citation.]" (*Id.* at p. 213.)

■    While it is true that the putative representative cannot adequately protect the class if his or her interests are antagonistic to or in conflict with the objectives of those he or she seeks to represent, a party's claim of representative status will only be defeated by a conflict that " 'goes to the very subject matter of the litigation.' " (*Richmond v. Dart Industries, Inc., supra*, 29 Cal.3d at p. 470.) Thus, antagonism per se by members of a class will not automatically preclude certification, given the state's policy of encouraging the use of the class action device. (*Id.* at p. 473.) As the *Richmond* court pointed out, " '[d]ifferences which do not raise questions as to the very legitimacy of the class action process, . . . but which merely reflect variances in view as to the proper outcome of a suit, do not provide reason for a court to refuse to hear a class suit.' " (*Ibid.*, quoting *Developments in the Law: Class Actions* (1976) 89 Harv. L.Rev. 1318, 1490 (*Developments*).) Thus, where factual circumstances differ, or class members disagree as to the proper theory of liability, the trial judge, through resort to subclasses, intervention, and the like, may incorporate class differences into the litigation process and afford all members their due in deciding the proper outcome. (*Richmond v. Dart Industries, Inc., supra*, 29 Cal.3d at p. 475, citing *Developments*, at pp. 1490–1492.)    ■    " 'Even if differences among class members are more fundamental, having to do with the type of relief which should be sought . . . , judicial accommodation appears to provide a sufficient mechanism for the protection of absentee interests. So long as a dispute concerns the outcome of litigation, the trial judge is in a position to isolate the differing positions, judge their validity in light of the substantive law governing the case, and shape the outcome of the suit to give the various class interests the weight to which the law entitles them.' " (*Richmond v. Dart Industries, Inc., supra*, 29 Cal.3d at p. 473, quoting *Developments, supra*, 89 Harv. L.Rev. at pp. 1490–1492.)

### 2. *The Trial Court's Ruling*

Treating the adequacy of representation issue, the trial court stated: "This is a peculiar case because the Court can safely presume that all the class

members would like thorough IPPs and the best services possible. The problem arises because each disabled person is different and 'the best services possible' for one person may not be appropriate for another person. The named plaintiffs have consistently asserted that each class member is entitled to live in the least restrained setting and that many will benefit from being removed from large institutions and placed into community settings. The Intervenors, however, argue that for many members of the class 'the best services possible' are in large institutions and that it would be detrimental to place them in community settings. [¶] . . . [¶] . . . The Court has already permitted the Intervenors to appear in this action, and they have had the opportunity to participate in all court proceedings. The presence of the Intervenors protects their interests because they could present evidence and make arguments to the trier of fact. [¶] The Court has also considered that because this case concerns systemwide injunctive relief, the Intervenors cannot elect to opt-out of the class. If the Court provides systemwide injunctive relief, then the policies of the [Department] and the regional centers will have to change and those changes will necessarily affect all persons in the system. [¶] The Court concludes that Plaintiffs have not demonstrated either (1) they will adequately represent the interests of all the members of the proposed class or (2) the interests of the Intervenors can be adequately protected by their presence in this case. This conclusion is based on a balancing of interests and case management concerns and is not directed at the integrity or competence of the named plaintiffs."

### 3. *Analysis*

We initially observe that in terms of the numerical strength of the interveners, there are only 11 individuals, less than .01 percent of the class. Interveners CASH/PCR and CAR are both nonprofit advocacy organizations. The organizational interests of these groups, while contributing an important voice, cannot in themselves conjure up a conflict within the class. CASH/PCR also asserts that nearly half of the developmental center residents have a family member, friend or conservator who is affiliated with the organization. Even if it were shown that interveners in fact represented the interests of these residents, such representation would extend to less than 20 percent of the class. Moreover, membership or affiliation with CASH/PCR does not equal agreement with CASH/PCR's position in this litigation.[14] Additionally, while the Lanterman Act does demonstrate an intent to include

[14] In connection with its motion to intervene and opposition to appellants' motion for class certification, CASH/PCR submitted declarations, claiming that its members were in uniform opposition to (1) the claims and relief sought by appellants "at least where relatives and conservators of CASH/PCR members are concerned" as well as (2) appellants' attempt to certify a class. Appellants correctly objected to these statements, inserting hearsay, foundational, relevancy and inadmissible opinion objections, but the trial court never ruled on the objections.

family members and conservators in the decisionmaking process affecting persons with disabilities (see §§ 4502.1, 4500.5), it provides them scant concrete rights.[15] (See §§ 4505, 4514.5, 4508.) Indeed, under the Lanterman Act it is the individual with a developmental disability—not his or her family, friends, or conservator—who is afforded all the legal rights and responsibilities guaranteed by the United States and California Constitutions. (§ 4502.) No matter how well intentioned parents and conservators may be, they cannot exert their influence to curtail or deny the due process rights of persons with developmental disabilities. (See *In re Hop* (1981) 29 Cal.3d 82, 93–94 [171 Cal.Rptr. 721, 623 P.2d 282].)

More to the point of the adequacy analysis, the liability question posed by this lawsuit is whether defendants' policies and practices comply with the law with respect to assessments, the IPP process and the array of services and placements available to afford community placement and services where appropriate. Interveners have registered their disagreement with appellants' view that certain policies and practices of defendants are unlawful, but this concern goes to the merits of appellants' claim, not to the issue of certification. In other words, this disagreement does not comprise antagonism that will defeat certification. Interveners have no legitimate interest, and thus can register no legitimate opposition, to a legal effort to enforce the Lanterman Act, the ADA, etc. Interveners have no legitimate interest in furthering any continuing violations of the law, or in preventing other class members from seeking systemic relief to correct any violations found by the court. Whether these laws have been violated is for the court to decide, with the help of interveners. As the court acknowledged, interveners can protect their interests by presenting evidence and making arguments to the trier of fact.

It is true, as the trial court articulated, that interveners and appellants have different philosophical perspectives on the issue of institutionalization.[16] However, philosophical differences do not amount to legally cognizable antagonism in this case particularly where, as here, in attempting to make a

---

[15] Their consent is required for electroconvulsive therapy or behavior modification (§ 4505) as well as provisional placement in a regional center (§ 4508). Additionally, pursuant to section 4514.5, family members are entitled to certain information about a resident's status.

[16] Respondents and interveners also make much of the fact that in opposing intervention, appellants stated that the interests of the organizational and parent representatives "are potentially and actually in conflict with the interests of the plaintiffs and the putative plaintiff class." Thereafter ensued a discussion of federal and state case law concerning actual and potential conflicts of interests that courts have articulated as existing between institutionalized individuals and family members. To be clear, appellants addressed conflict between the parent and organizational interveners and the putative class. Appellants did not assert any interest that conflicted with interveners who are actual putative class members.

foolproof case of antagonism, interveners have consistently overstated, misstated and exaggerated appellants' position and the relief sought. As a consequence, the trial court made erroneous assumptions about the heart of this litigation.

For example, interveners asserted and continue to assert that appellants "seek to end all institutional care in California, and advocate placement of all persons with developmental disabilities in small, community-based programs." The referenced pages of the complaint alleged that thousands of Californians with developmental disabilities are unnecessarily institutionalized, but in no manner does the complaint assert that institutional care should be ended. And again, interveners insisted below that appellants "seek to move nearly every individual currently living in a [developmental center] into a community care facility" and repeat here that appellants have so stated their intention to do that. The pages interveners reference make it clear that the relief sought in this lawsuit would not dictate the outcome of the process for any individual class member and spoke of avoiding unnecessary institutionalization, not of moving everyone into the community.

The trial court perceived the differing philosophical perspectives as a chasm: On the one hand are the named plaintiffs who assert class members' entitlement to live in the least restrictive environment appropriate to the circumstances, and take the position that many will benefit from moving from large institutions to a community setting. On the other hand are interveners who argue that for many the best services are available in institutions and community placement would be detrimental. These differing perspectives do not comprise a legal conflict because they are not categorical—rather, they represent "half-full" and "half-empty" variations on the theme of residential placement. As the trial court understood, both views share the common, overarching goal of ensuring the proper and thorough development of IPP's and the availability of services to meet each class member's needs. There is no conflict between that overarching goal and the subject matter of this lawsuit, namely whether respondents' policies and practices violate legal mandates calling for placement options and support services in the least restrictive environment commensurate with personal needs.

It appears that the trial court was particularly concerned with the reality that interveners could not opt out because the relief sought was systemwide injunctive relief which, if provided, everyone would have to live with. Interveners stress that more cohesiveness within a class is required when the remedy is limited to injunctive and declaratory relief, citing *Barnes v. American Tobacco Co.* (3d Cir. 1998) 161 F.3d 127, 142–143. First, the plaintiffs in *Barnes* pursued certification of a medical monitoring class under rule 23(b)(2); they did not pursue institutional reform. Second, what the court

and interveners overlook is the fact that interveners, as well as the state actors and regional centers, would be part of the effort forging any systemwide solution to any documented unlawful practices or policies. Differences among class members about the type of relief sought and the outcome of the litigation can be accommodated by the trial judge whose job is to give the various class interests the proper weight under the applicable substantive law. (*Richmond v. Dart Industries, Inc., supra*, 29 Cal.3d at p. 473, citing *Developments, supra*, 89 Harv. L.Rev. at pp. 1490–1492.) In addition, we repeat that the subject matter of this case and the reforms pursued are not about the actual outcomes of an individualized IPP process, including individualized determinations about placement.

D.  *Superior Means for Resolving the Litigation*

Finally, consistent with the misunderstanding that marked its decision on commonality, the trial court ruled that the alleged wrongs could not readily be cured on a classwide basis and that the fair hearing procedure set forth at section 4701 et seq. an adequate substitute for resolving appellants' claims. This ruling cannot stand. Nonetheless, respondents and interveners continue to cling to the notion that individual action will solve the core issues defined in this litigation.

Respondents and interveners are unable, or unwilling, to grasp the "big picture" nature of this litigation. Appellants' position is this: *Before* the outcome of improved individualized assessment, services and community supports tailored to the unique needs of each person with a developmental disability can be realized, the policies that undergird decisionmaking and allocation of resources must be changed. As we explain, the class action mechanism is the only alternative that can achieve this end.

The Lanterman Act's fair hearing procedures are designed generally to decide "all issues concerning the rights of persons with developmental disabilities to receive services under [the Lanterman Act]." (§ 4706, subd. (a).) Any applicant for or recipient of services, or his or her authorized representative, "who is dissatisfied with any decision or action of the service agency which he or she believes to be illegal, discriminatory, or not in the recipient's or applicant's best interests" is afforded the opportunity for a statutory fair hearing. (§ 4710.5, subd. (a).)

Appellants have sought systemic mandamus, injunctive and declaratory relief—relief that the fair hearing process cannot provide. By definition, design, structure and scope, the Lanterman Act fair hearing procedure is for individual adjudication of claims and is thus unavailable for, and/or incapable of, delivering classwide systemic relief. No one disputes, for example, that a

hearing officer presiding over the fair hearing procedure adjudicates *individual* claims and grievances and cannot grant the requested injunctive relief. Moreover, should an individual petition for writ of mandate on a test case basis, any resulting writ would constitute an inadequate remedy because class members are not parties to an individual decree and could not enforce the writ by contempt or supplemental decree. (*Miller v. Woods* (1983) 148 Cal.App.3d 862, 872 [196 Cal.Rptr. 69].) The class action mechanism thus is favorable in this instance because it affords finality of judgment binding on all parties and the enforceability of class judgments through contempt or supplemental decrees.

Further, without class treatment there could be multiple actions that would burden the litigants and the courts with cumulative and excessive expenses, discovery efforts and evidence. We recognize that the devices of joinder, consolidation, intervention and the test case are available in the context of multiple litigation, and the Department specifically points out that putative class members could intervene in a test case to ensure that a writ of mandate was properly enforced. First, the outcome of a motion to intervene would not be a foregone conclusion. Second, these devices are insufficient to vindicate legal rights because their use is premised on a group of parties with the economic and general wherewithal, willingness and ability to look after their own interests individually through individual suits. (*Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 934–935 [179 Cal.Rptr. 287].)

■ The very nature of this class cries out for class treatment and a systemic approach because the individuals whose rights allegedly have been violated are persons with cognitive or other severe disabilities, many without the resources to undertake the complex and daunting task of suing the myriad agencies involved in the delivery of services. The reviewing court in *Reyes v. Board of Supervisors, supra,* 196 Cal.App.3d at page 1270, footnote 6, said it well: " 'It is well settled that class actions are an appropriate procedure in government benefit cases where statutes and policies are likely to have an impact upon a broad class of recipients. . . .' [Citation.] . . . [C]lass actions for injunctive or declaratory relief serve the additional objectives particularly important in government benefits litigation, including institutional changes, 'facilitating enforcement of a favorable judgment, and protecting the interests of affected class members from the burden of bringing individual actions to establish the applicability of a decision for their benefit. . . .' [Citation.]"

### III.   DISPOSITION

■ The order denying class certification cannot stand because it was based on improper criteria and incorrect legal assumptions. Had the trial court properly analyzed appellants' theory of recovery and approach, it would have

found commonality. Had it understood the type of conflict that will defeat adequacy of representation, it would not have concluded that appellants failed to establish this element. And finally with these proper understandings it would have recognized that the class action was the only way to resolve appellants' claims. Therefore, we reverse the judgment and direct that the trial court certify the class.

Sepulveda, J., and Rivera, J., concurred.

The petition of all respondents for review by the Supreme Court was denied January 3, 2008, S157911. Werdegar, J., did not participate therein.