Filed 10/24/22  Plantier v. Ramona Municipal Water District CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| EUGENE G. PLANTIER, as Trustee, etc. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> RAMONA MUNICIPAL WATER DISTRICT, <br><br> Defendant and Respondent. | D079529 <br><br><br> (Super. Ct. No. 37-2014-00083195-CU-BT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

Patterson Law Group, James R. Patterson and Jennifer M. French; Carlson Lynch and Todd D. Carpenter for Plaintiffs and Appellants Eugene G. Plantier, as Trustee of the Plantier Family Trust, Progressive Properties Incorporated and Premium Development, LLC.

Procopio, Cory, Hargreaves & Savitch, John D. Alessio, Adriana R. Ochoa and Gregory V. Moser for Defendant and Respondent.

Hanson Bridgett, Adam W. Hofmann and Sean G. Herman for California Association of Sanitation Agencies as Amicus Curiae on behalf of Defendant and Respondent.

Appellants Eugene G. Plantier as trustee of the Plantier Family Trust, Progressive Properties Incorporated (at times, Progressive), and Premium Development, LLC (at times, Premium Development) brought a putative class action against respondent Ramona Municipal Water District (District), seeking declaratory and monetary relief for District's alleged violation of Proposition 218 (Cal. Const., art. XIII D, § 6[1]) in its method of setting sewer charges. They appeal an order in which the trial court decertified their class action on grounds of an irreconcilable conflict among class members, based in part on the court's sua sponte reconsideration of a 2015 order granting class certification. Plaintiffs contend the court abused its discretion in reconsidering the class certification order. They further contend the court erred because (1) they pleaded that the sewer service charges exceeded the funds required to provide the service, and thus the entire class was overcharged; (2) there was no conflict of interest among class members; and (3) District did not meet its burden on its decertification motion. Plaintiffs finally contend the court abused its discretion by failing to permit them to file a renewed class certification motion or amend the class definition or claims. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

District provides water and wastewater (sewer) services to businesses and residents in an unincorporated area of San Diego County. (See *Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 376 (*Plantier*).) It

_____

1     References to section 6 are to article XIII D of the California Constitution.

2

charges for sewer service based on estimated wastewater capacity needs, flow and strength for different customer types or classes. District uses an "Equivalent Dwelling Unit" (EDU) system, levying fixed sewer rates based on the number of EDU's assigned to the particular type of development. An EDU is a measure representing the daily usage of a typical single family home (200 gallons per day of wastewater flow and 200 milligrams per liter each of biological oxygen demand and suspended solids). EDU's are assigned to each property based on the type of use and the property's estimated wastewater system capacity needs. Each parcel connected to the sewer system is charged for service by multiplying the fixed sewer service charge per EDU by the number of EDU's assigned to the parcel.

In November 2013, Plantier and Progressive presented a claim against District, attaching and incorporating a draft complaint "stat[ing] the factual allegations upon which th[e] claim [was] based." The complaint alleged that District's EDU system "does not meet the requirements set forth in . . . Section 6(b)(3) . . . and related statutory requirements" and thus the fees were unlawful and invalid. It alleged the sewer service charge was subject to section 6(b)(3), and in violation of that section, the charge was "imposed based solely on EDU[']s, without regard to actual wastewater use, a property's proportional burden on the wastewater system, or the actual cost of providing a property with wastewater service." The complaint alleged that the lack of a rational relationship between the sewer charge and actual wastewater use "resulted in the systematic overcharge of wastewater consumers for whom the proportional cost of providing their property with wastewater service is less than their EDU-based [sewer charge]." It also alleged District's connection fees were invalid, as they were also "imposed on a per-EDU basis without regard to the cost of 'the physical facilities

3

necessary to make a . . . sewer connection' " and thus did not meet the definition of Government Code section 66013, subdivision (b).

In January 2014, after District rejected the claim, plaintiffs filed a putative class action complaint alleging in part that District's EDU billing system violated Proposition 218. The operative first amended complaint, brought on behalf of all District customers who paid a sewer service charge on or after November 22, 2012, sought declaratory relief as well as damages in the form of a refund of the assertedly unlawful charges. Plaintiffs repeated their allegations concerning how District's charges violated section 6(b)(3). They again alleged that the lack of a rational relationship between the sewer charge and actual wastewater use "resulted in the systematic overcharge of wastewater consumers for whom the proportional cost of providing their property with wastewater service is less than their EDU-based [sewer charge]."[2]

Plaintiffs successfully moved for and obtained certification of the requested class before Judge Timothy Taylor. In part, plaintiffs argued District's liability could be determined " 'in one stroke' " because it had uniformly applied its arbitrary EDU schedule and EDU-based charges to all parcels connected to the sewer system during the class period, the charges were assessed in the same manner, and all of those charges violated section 6(b)(3). Judge Taylor ruled common issues—namely, whether the EDU-based

---

[2] Plaintiffs dropped their allegations concerning Government Code section 66013 with regard to District's connection fees.

4

charges violated section 6(b)(3)—predominated over individual issues.[3]

Judge Taylor ruled the proposed class was ascertainable and numerous,[4]

---

[3] On this point, Judge Taylor's ruling states: "Plaintiffs' lawsuit is based on the contention that all [sewer charges] assessed on all parcels in the [District] violate . . . [s]ection 6(b)(3) . . . given the [sewer charges] are based on an EDU system that is not rationally related to actual water use. . . . The common issue of whether [District's] EDU-based [sewer charge] violates . . . [s]ection 6(b)(3) . . . will predominate over individual issues. The evidence presented in the motion preponderates in favor of a finding that class-wide issues will predominate. [¶] In this respect, [District] uniformly applied its EDU-based [sewer charges] to all parcels connected to the sewer system throughout the class period. . . . All parcels are given an EDU value based on the Schedule of EDU[']s. . . . All parcels are then assessed the fixed [sewer charge] multiplied by the number of EDU[']s assigned to the parcel. . . . The [sewer charge] is assessed the same in both the Santa Maria and San Vicente Sewer Service Areas, with the parcels assigned a number of EDU[']s, and the [sewer charge] is assessed based on the schedule of EDU[']s. . . . And there is no difference on how the [sewer charges] for each service area are billed. . . . [District's] contention that the Bartle Wells report provided a rational basis under Prop[osition] 218 for the EDU-based [sewer charges] is susceptible to class-wide determination 'in one stroke.' [(*Wal-Mart v. Dukes* [(2011)] 131 S. Ct. 2541, 2551.)]"

[4] The court ruled: "[District] has records of the parcel number and owner name for each of the parcels subject to the [sewer charge] during the class period. . . . The parcel owners should be identifiable through public records of ownership. Any need to ascertain the identity of those who actually paid the [sewer charge] may be obtained through notice to the parcel owners or other discovery modalities. [¶] The proposed class is numerous. There were 1750 parcels in the Santa Maria Sewer Service Area and 5141 parcels in the San Vicente Sewer Service Area in the July 2014 assessment roll."

5

that plaintiffs were adequate class representatives,[5] and that the plaintiffs' claims were typical of the class, as plaintiffs and the class members were assigned EDU values and assessed sewer charges based on that value. Judge Taylor found no present conflict of interest among the class members, ruling: "To the extent there is a potential for conflict among the class members, the matter may be resolved later. A mere potential conflict is not a ground for denying certification. . . . However, if a conflict in fact arises, the class action may be decertified."

After a bench trial, the court ruled plaintiffs failed to meet an exhaustion of administrative remedies requirement in Proposition 218 because none of them had participated in a Proposition 218 rate increase hearing. (*Plantier, supra*, 7 Cal.5th at p. 379.) This court reversed, and the California Supreme Court in *Plantier* affirmed that decision. (*Id.* at p. 390.)

---

[5] The court ruled: "[Plaintiffs] declare that they have paid the [sewer charges] based on [District's] EDU system during the class period. . . . They also state that they understand the claims in this lawsuit, the nature of those claims, and that they 'have to cooperate with my attorneys and treat the interests of the proposed class members the same as I would my own.' . . . They declare that they are 'willing to serve as a representative of other persons who have paid' the [sewer charge] 'in this lawsuit by participating in any way that is necessary to act in the best interests of the class.' . . . They acknowledge that they cannot have any legal conflicts with the class. . . . The class representative, through qualified counsel, must be capable of 'vigorously and tenaciously' protecting the interests of the class members. . . . They make this showing. Plaintiffs may represent the customers in the San Vicente Sewer Service Area [even though they are rate payers in the Santa Maria Sewer Service Area] since [District] admits it assesses the EDU-based [sewer charge] in the same manner in both the San Vicente and Santa Maria Sewer Service Areas. . . . [District's] perceptions regarding the true motives of Mr. Plantier . . . may ultimately impact the level of success enjoyed by the class, but do not prevent certification."

6

Following remand, plaintiffs challenged Judge Taylor and the matter was reassigned to Judge Gregory Pollack, who notified the parties the court had concerns over a conflict of interest between class members who underpaid for sewer services and those who overpaid. Judge Pollack eventually granted District leave to file a motion to decertify the class.

In its decertification motion, District argued the calculation of sewer service charges was a "zero-sum" scenario. It argued the appellants' class "includes both **harmed** ratepayers who were allegedly overcharged, and **unharmed**—indeed, benefitted—ratepayers who (if Plaintiffs' theory is correct) were allegedly undercharged. Courts have consistently found that grouping harmed and unharmed persons into a class definition makes the class imprecise, overbroad, and unable to meet the ascertainability prong necessary for maintaining a class action." District maintained the plaintiffs' proportionality challenge, as well as their claim for a refund, created fatal conflicts of interest among the class members, defeating any claim that they had a well-defined community of interest. According to District, the proposed relief—refunding charges to overpaying customers—would permit it to seek back charges from customers who underpaid, underscoring the current and potential conflicts. It argued that awarding *all* charges paid since 2012 would amount to an over $50 million judgment that District would have to pay by assessing charges to current ratepayers, creating another conflict. District also argued plaintiffs failed to show sufficient causation for liability of damages to justify certification, and they could not show they had suffered overcharges or that their claims were consistent with all other ratepayers, thus they were inadequate class representatives. Finally, they argued because Plantier and Orrin Day, the owner of Progressive and Premium

7

Development, were commercial property owners who did not live in Ramona, their interests were antagonistic to the majority of class members.

District supported its motion with declarations from Alex Handlers, a principal at an independent public financial advisory firm with expertise in water and sewer rates and finance, Michael Metts, a professional engineer at a firm with a wastewater practice and Craig Schmollinger, District's acting general manager and chief financial officer. It attached deposition excerpts from various putative class members, some of whom testified they would be upset if their sewer rates increased as a result of the lawsuit, and would want their lawyers to stop prosecuting the lawsuit if that were the case.

In opposition, plaintiffs argued District did not identify new law or evidence of changed circumstances to justify decertifying the class. They asserted District did not present evidence, much less new evidence, showing an actual conflict among the class or showing any class member had been undercharged during the class period. Further, plaintiffs argued District could not meet its burden to prove compliance with Proposition 218, in part because class members were charged over $8 million more than the cost of the service provided during the class period. Plaintiffs maintained District made the same "future conflict" argument in opposing their original class certification motion by way of the zero-sum game theory of undercharges and overcharges, its assertedly new evidence submitted via declaration merely repeated the point, and that such speculative, future conflicts were an insufficient basis to decertify the class. They argued that District's future conflict argument failed because District collected inflated or excess revenues. Finally, plaintiffs argued the minority class members' interests could not defeat the right of the majority of customers to enforce Proposition 218; that class members had no legitimate interest in furthering continuing

8

violations of Proposition 218. Plaintiffs based their excess revenue arguments in part on sworn declarations from consultant and accountant Daniel Werner and consultant Christine DeMaster.

In reply, District objected to both the entirety and portions of DeMaster's and Werner's declarations on grounds, among others, of relevance, hearsay, and lack of expert qualifications. In part, it argued the court should disregard plaintiffs' theory that its sewer service charges exceeded the funds required to provide the service—a violation of section 6(b)(1)—because it was a new legal theory not pleaded in their operative complaint. District also argued plaintiffs' theory went beyond its government claim, which was based on the proportionality requirement of section 6(b)(3). It argued plaintiffs did not rebut its assertion that the class was unascertainable because it included harmed and unharmed class members, nor did they meet their burden to establish causation for liability and damages for all class members.

The court decertified the class. Sustaining District's objections to the DeMaster and Werner declarations and granting District's requests for judicial notice, it ruled the class as certified created an irreconcilable conflict

9

among class members.[6]  It found the single common issue—whether District's EDU methodology was legally permissible under section 6(b)(3)—did not predominate over the many individual issues.  At the same time the court ruled on District's decertification motion, it sua sponte reconsidered Judge Taylor's 2015 order granting class certification, considering only the evidence before the court in 2015.  Judge Pollack specifically ruled he had the inherent authority to do so as long as he gave the parties an opportunity to fully brief the matter, and considered only the evidence originally submitted to Judge Taylor.  Judge Pollack ruled Judge Taylor's class certification order was erroneous:  "Changing the methodology for determining proportionate allocation of sewer charges does not simply create '[a] mere potential conflict'; it creates an absolute, irreconcilable conflict *ab initio.*  . . .  [I]t is evident that Judge Taylor failed to appreciate the certainty of the conflict created by his certifying a class consisting of 'Ramona Municipal Water District customers

---

[6]    In part, the court reasoned:  "[T]he fatal defect in the previous certification of the class arose from a failure to fully appreciate that Plantier's challenge to the status quo method for determining proportionate sewer system charges for individual payors created an inherent and irreconcilable conflict between those class members whose proportionate shares go up and those class members whose proportionate shares necessarily go down, *i.e.,* since the 'pie' from which proportionality must be allocated always totals 100 [percent], a 'zero[-]sum' game is created if any payer's proportionate share is changed.  If one class member payer's proportion is reduced, necessarily other class member payor(s)' proportion(s) must increase.  A lawsuit like this, premised upon 'robbing Peter to pay Paul' is inherently improper when Peter and Paul are both plaintiffs in the same lawsuit (and represented by the same law firm).  Clearly, a challenge to the status quo as to how proportionate allocation is calculated necessarily creates winners and losers among class members, with the winners necessarily gaining at the direct expense of the losers.  It bears repeating: a lowering of a class member's proportionate sewer charges necessarily means an increase in other class member(s)' proportionate sewer charges."

10

who paid a sewer service charge on or after November 22, 2012.' It is an abuse of discretion to certify a class action where there is 'evidence of a conflict among proposed class members that goes to the very subject matter of the litigation.' [Citation.] '[I]f the conflict of interest actually arises and it is irreconcilable, the class action may be decertified.' [Citation.] This is such a case. [¶] Similarly, because some class members have been allegedly harmed by [District's] use of the subject EDU assignment method, others have necessarily benefitted based upon the zero-sum scenario, thereby creating a class containing both 'harmed' and 'unharmed' members. Courts have 'consistently denied certification where class definitions include both harmed and unharmed members.' [Citation.] It should be noted that other than claiming that [District's] methodology is illegal, Plantier has never proposed a specific alternative methodology from [which] the 'winners and losers' and 'harmed or unharmed' class members could be ascertained and differentiated."

Judge Pollack found plaintiffs' argument concerning excess revenues flawed in part because it stated a violation of section 6(b)(1), a theory not pleaded in their operative complaint: "The original governmental tort claim, the original complaint, and the legally operative first amended complaint . . . contain no facts or allegations that [District's] sewer service charges exceeded the total cost of providing services, and, in fact, they do not even mention [section] 6(b)(1). Since the filing of this lawsuit on January 14, 2014, the thrust of Plantier's attack has been under the proportionality requirement found in [section] 6(b)(3)." Judge Pollack ruled for that reason the theory was not cognizable on the merits of class certification, but even if it were, it would not resolve the conflict among class members. Judge Pollack ruled that permitting class counsel at that stage to pare down the class to only members

11

whose proportionate allocations would be reduced would likely result in the law firm's ethical conflict of interest "since such would constitute representation of clients (the 'winners') in an action adverse to the interests of the abandoned former clients (the 'losers') in the same action."

Plaintiffs filed this appeal.

DISCUSSION

I. *Application of the Death Knell Doctrine*

We begin by addressing District's contention that the trial court's order decertifying the class is not an immediately appealable "death knell" order. Pointing to case authority stating the death knell concept is "tightly defined and narrow" (*Farwell v. Sunset Mesa Property Owners Assn., Inc.* (2008) 163 Cal.App.4th 1545, 1547), District maintains the death knell doctrine is inappropriate in cases where individual actions can be filed and pursued, and cites authorities declining to apply the doctrine where the order did "not produce a terminal result . . . ." (*Haro v. City of Rosemead* (2009) 174 Cal.App.4th 1067, 1070 (*Haro*); see also *Naranjo v. Spectrum Security Services, Inc.* (2019) 40 Cal.App.5th 444, 478 [ruling was " 'not . . . tantamount to dismissal' "], affd. in part & revd. in part in *Naranjo v. Spectrum Security Services, Inc.* (2022) 13 Cal.5th 93, 126.) According to District, because the plaintiffs here incurred sewer service charges that are more than nominal (approximately $50,764 for Plantier, $46,521 for Progressive, and $53,748 for Premium Development), they have a financial incentive to maintain the action and thus the doctrine does not apply. Notably, District has not moved to dismiss the appeal on this ground; we conclude in any event there is no basis to do so.

The death knell doctrine is an exception to the "one final judgment" rule, under which an appeal may be taken only from a final judgment in the

12

entire action. (*In re Baycol Cases I and II* (2011) 51 Cal.4th 751, 754, 756, 757; see *Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 280, fn. 4.) The doctrine "allows an immediate appeal of an order that entirely terminates class claims while allowing individual claims to proceed." (*Fierro*, at p. 280, fn. 4.) In fact, the "preservation of individual claims is an essential prerequisite to application of the death knell doctrine . . . ." (*Baycol*, at p. 754.) "Because such an order 'effectively [rings] the death knell for the class claims,' it is essentially 'a final judgment on those claims.' " (*Fierro*, at p. 280, fn. 4, citing *Baycol*, at p. 757 & *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 699 [order denying class certification "is tantamount to a dismissal of the action as to all members of the class other than plaintiff"].) The order here—decertifying the entire class—is such an appealable death knell order.

District's cited authorities do not convince us otherwise. In *Naranjo v. Spectrum Security Services, Inc.*, *supra*, 40 Cal.App.5th 444, the Court of Appeal, relying on *In re Baycol Cases I and II*, *supra*, 51 Cal.4th 751, held an order was not immediately appealable under the death knell doctrine where the trial court certified meal break, waiting time penalty, and itemized wage statement penalty classes, but denied certification for a rest break class. (*Naranjo*, at p. 478.) That ruling was " 'not . . . tantamount to dismissal' " of the class claims. (*Ibid.*) *Naranjo* confirmed that " 'only an order that entirely terminates class claims is appealable.' " (*Ibid.*, quoting *Baycol*, at pp. 757-758.) District does not explain what aspect of Judge Pollack's order retains part of the class as in *Naranjo*, nor can it, as the order eliminated those claims in their entirety.

*Haro*, *supra*, 174 Cal.App.4th 1067 involved an action under the Fair Labor Standards Act of 1938 (FLSA). (*Id*. at p. 1070.) That law permits actions brought " 'by any one or more employees for and in behalf of himself

13

or themselves and other employees similarly situated' " and further contains an " 'opt-in' " provision prohibiting an employee from being a FLSA action plaintiff "unless he gives his consent in writing . . . and such consent is filed in the court in which such action is brought." (See *Haro*, at p. 1071, quoting title 29 of the United States Code section 216(b), italics omitted.) Because of the special opt-in feature, the plaintiffs' challenge relating to their compensation under the FLSA could not as a matter of law be brought as a class under California law, as that feature was "irreconcilable" with a class action. (*Haro*, at pp. 1071, 1075 [an "FLSA action has a procedural jurisprudence distinct from that which governs class actions"].) It was in this specialized context that the Court of Appeal dismissed the appeal from the order denying class certification, since, among other reasons, the order was not the death knell of the appellants' action: "The order does not produce a terminal result, i.e., there [was] no reason why the action cannot go forward with appellants as plaintiffs" and specifically, "there [was] nothing to prevent this action going forward as an opt-in, *collective* FLSA action." (*Id*. at p. 1078, italics added.) Thus, there was "no question that this FLSA action as it is presently constituted can go forward to trial," that is, as an action with multiple employees as plaintiffs, so long as they opted in. (*Ibid*.)

Similarly, *Munoz v. Chipotle Mexican Grill* (2015) 238 Cal.App.4th 291 involved an action for civil penalties under the Private Attorneys General Act (PAGA), under which plaintiffs do not sue as individuals, but as representatives of the state and on behalf of similarly aggrieved employees. (*Id*. at pp. 294, 310.) The appellate court dismissed the appeal from an order denying class certification because the PAGA claims on behalf of multiple employees remained (with the potential for significant civil penalties if successful), and thus the death knell doctrine did not apply. Finding the

14

unique circumstances there (*id*. at p. 310) similar to *Haro*, *supra*, 174 Cal.App.4th 1067, *Munoz* held the plaintiffs had "ample financial incentive to pursue the remaining representative claims under the PAGA and, thereafter, pursue their appeal from the trial court's order denying class certification." (*Munoz*, at p. 311.) Thus, "[d]enial of class certification where the PAGA claims remain in the trial court would not have the 'legal effect' of a final judgment under the reasoning of *Baycol* and *Daar*." (*Ibid*., fns. omitted.)[7]

Unlike the FLSA action in *Haro* or the PAGA action in *Munoz*, absent class certification, the present action against District cannot proceed with the individuals acting on behalf of other unnamed class members. The order decertifying the class in this case does not have the special circumstances of *Haro* and *Munoz*; it is therefore immediately appealable.

II. *Court's Authority to Sua Sponte Reconsider the Class Certification Order*

Plaintiffs contend the trial court abused its discretion in sua sponte reconsidering Judge Taylor's factual finding in his prior certification order concerning the asserted conflict of interest among class members. According

---

7    *Farwell v. Sunset Mesa Property Owners Assn., Inc.*, *supra*, 163 Cal.App.4th 1545 is entirely inapposite, as it involved an appeal by plaintiffs from an order sustaining a demurrer to their action with leave to amend against a *defendant class*. (*Id*. at pp. 1547, 1549; see *Williams v. Impax Laboratories, Inc.* (2019) 41 Cal.App.5th 1060, 1070 [distinguishing *Farwell*].) *Farwell* dismissed the appeal, in part holding the order neither demolished a class action nor did it dispose of class claims, so it was not appealable as a death knell order. (*Farwell*, at p. 1552; see *Williams*, at p. 1070.) *Farwell* also explained that "the gist of the death knell doctrine is that the denial of class action certification is the *death knell of the action itself,* i.e., that without a class, there will not be an action or actions, as is true of cases when the individual plaintiff's recovery is too small to justify pursuing the action." (*Farwell*, at p. 1552.) We do not read *Farwell*'s use of an example as a limitation on the doctrine or a holding that for the death knell doctrine to be applicable, the individual plaintiffs' potential recovery must be de minimis.

15

to plaintiffs, there is no authority for the court's reconsideration of Judge Taylor's factual findings, as reconsideration is authorized when " 'there has been a change of law' " pursuant to Code of Civil Procedure section 1008, subdivision (c). Plaintiffs also complain the court abused its discretion given the prejudice they have suffered from delay, pointing to the procedural history of the case after remand and the various ex parte applications and continuances, while at the same time conceding "the parties agreed to extend the hearing on [District's] motion multiple times from December 2020 to July 2021."[8] They assert they spent thousands of dollars in expert witness fees and attorney fees and costs associated with their opposition, and argue "[a]llowing reconsideration of the class certification order over six years later [after they filed the action], and over 500 days after the trial court initially expressed concern with the ruling, is fundamentally unfair and an abuse of discretion."

Plaintiffs' proposed limitation on the court's authority to sua sponte reconsider its order is based on *LeFrancois v. Goel* (2005) 35 Cal.4th 1094. They assert, citing *LeFrancois*, at page 1097, that in its opinion, the California Supreme Court had " 'accepted' " the Court of Appeal's finding " 'that notwithstanding either [Code of Civil Procedure] section 1008 or [Code of Civil Procedure] section 437c[, subdivision](f)(2), [the second judge] had inherent power to exercise his "constitutionally derived authority to

---

8        Plaintiffs also assert that District filed its decertification motion beyond the court's deadline for doing so, but cite no authority demonstrating the court erred by later resetting the motion hearing date at District's ex parte request. We disregard assertions unsupported by authority or reasoned legal argument. (*Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 383 [" ' "The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived" ' "]; *DP Pham, LLC v. Cheadle* (2016) 246 Cal.App.4th 653, 674.)

reconsider the prior interim ruling and *correct an error of law* on a dispositive issue." ' " Plaintiffs say the high court's "determination makes sense given the language in Code of Civil Procedure section 1008, subdivision (c), which allows a court to reconsider a prior order when 'there has been a change of law.' " This argument appears to suggest that *LeFrancois* somehow endorsed a limitation on a lower court's authority to reconsider prior orders to circumstances involving new or changed law.

The argument both misconstrues and misunderstands *LeFrancois*'s holding. There, the California Supreme Court accepted the Court of Appeal's finding that *a party's second summary judgment motion* was based on the same law and evidence, and thus violated Code of Civil Procedure sections 1008 and 437c. (*LeFrancois v. Goel, supra*, 35 Cal.4th at p. 1099.) It went on to review *the significance* of that finding on the trial court's authority to consider the motion. (*Ibid*.) *LeFrancois* held that while Code of Civil Procedure sections 1008 and 437c, subdivision (f)(2) limit the circumstances in which *parties*' may seek reconsideration, they "do not limit the court's ability, on its own motion, to reconsider its prior interim orders so it may correct its own errors." (*LeFrancois*, at p. 1107; accord, *Brown, Winfield &*

17

*Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1248 [discussing *LeFrancois*].)[9]

*LeFrancois* specifically addressed the language of Code of Civil Procedure section 1008, subdivision (c), which states that a court on its own motion may reconsider a prior order "if [it] at any time determines that there has been a change of law . . . ." (*LeFrancois v. Goel, supra*, 35 Cal.4th at p. 1105.) It acknowledged that language contained a "negative implication that the court may not reconsider such an order absent a change in the law" but *declined to give it effect* in view of a different negative implication in subdivision (e) that pointed "more strongly" to a narrow interpretation of the statute. (*Id.* at p. 1106 ["we cannot give effect to both contradictory negative implications"].) It instead held there was "no hint that the Legislature wanted to hinder the courts' ability to act . . . ." (*Ibid.*) Consequently, subsequent cases hold that "[e]ven without a change of law, a trial court may exercise its inherent jurisdiction to consider an interim ruling." (*Pinela v. Neiman Marcus Group, Inc.* (2015) 238 Cal.App.4th 227, 237; see also *Chen v. Valstock Ventures, LLC* (2022) 81 Cal.App.5th 957, 968 [quoting *Pinela*]; *State of California v. Superior Court* (*Flynn*) (2016) 4 Cal.App.5th 94, 100

---

[9]     Subsequent to *LeFrancois v. Goel, supra*, 35 Cal.4th 1094, the high court pointed out "it is immaterial what may have triggered a trial court's insight that its interim order might be erroneous: . . . 'If a court believes one of its prior interim orders was erroneous, it should be able to correct that error no matter how it came to acquire that belief' " as long as it meets certain procedural protections. (*Brown, Winfield & Canzoneri, Inc. v. Superior Court, supra*, 47 Cal.4th at p. 1249.) *Brown* cited the holding of *In re Marriage of Barthold* (2008) 158 Cal.App.4th 1301 for the proposition that a reconsideration motion might violate Code of Civil Procedure section 1008 if unsupported by new legal authority or new evidence, but such a motion may nevertheless inspire the trial court to reconsider its previous decision on its own motion. (*Brown*, at p. 1249, citing *Marriage of Barthold*, at p. 1308.)

[same].)  There is no basis in *LeFrancois* for plaintiffs' proposed limitation on Judge Pollack's power to sua sponte reconsider Judge Taylor's order.[10]

With respect to prejudice from delay, plaintiffs cite no authority for the proposition that a court abuses its discretion by reconsidering a class certification order years after it was issued, or that prejudice from delay, if shown, justifies maintaining a class.  To the contrary, after a class is certified, "a trial court retains flexibility to manage the class action, including to decertify a class if 'the court subsequently discovers that a class action is not appropriate.' " (*Kight v. CashCall, Inc.* (2014) 231 Cal.App.4th 112, 136; accord, *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 29-30 ["decertification must be ordered whenever a trial plan proves unworkable"].) There is no basis to conclude Judge Pollack abused his discretion by reconsidering the class certification order strictly due to the passage of time between the original order and District's decertification motion.  In sum, plaintiffs have not demonstrated Judge Pollack abused his discretion procedurally by sua sponte reconsidering Judge Taylor's order.

---

10    Plaintiffs do not argue Judge Pollack was precluded from reviewing Judge Taylor's order under the general rule that prevents a judge from reconsidering or overruling the interim ruling of another judge. (See *In re Marriage of Oliverez* (2015) 238 Cal.App.4th 1242, 1248.)  Because they do not invoke this rule, we have no occasion to decide whether the matter falls within one of the narrow exceptions—the first judge being unavailable to reconsider the motion—by virtue of plaintiffs' challenge to Judge Taylor. (See *ibid*.; and see *In re Marriage of Furie* (2017) 16 Cal.App.5th 816, 831, fn. 10 [transfer to another department of the same superior court does not render a judge unavailable for purposes of Code of Civil Procedure section 1008].)

### III. *Merits of Decertification Order*

We turn to the merits of the court's order. Plaintiffs contend the court erred by decertifying the class based on two grounds that assertedly rest on improper criteria or erroneous legal assumptions. They also contend the court erred by finding District met its burden to establish decertification. After a brief discussion of legal principles of class certification and decertification, as well as relevant sections of Proposition 218, we address these grounds in turn.

### A. *Class Action Certification and Decertification*

A party seeking class treatment " 'must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] "In turn, the 'community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' " ' " (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 352, quoting *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021; see also *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 968-969.)

"Typically, '[t]he adequacy of representation component of the community of interest requirement for class certification comes into play when the party opposing certification brings forth evidence indicating widespread antagonism to the class suit.' [Citation.] ' "It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent. But only a conflict that goes to the very subject matter of the

litigation will defeat a party's claim of representative status." ' " (*Espejo v. The Copley Press, Inc.*, *supra*, 13 Cal.App.5th at p. 352.)

As we have stated, after certification, a trial court retains flexibility to manage the class action, including to decertify a class if a class action is no longer appropriate. (*Espejo v. The Copley Press, Inc.*, *supra*, 13 Cal.App.5th at p. 353; *Kight v. CashCall, Inc.*, *supra*, 231 Cal.App.4th at pp. 125-126.) "To prevail on a decertification motion, a party must generally show 'new law or newly discovered evidence showing changed circumstances. [Citation.] A motion for decertification is not an opportunity for a disgruntled class defendant to seek a do-over of its previously unsuccessful opposition to certification. "Modifications of an original class ruling, including decertifications, typically occur in response to a significant change in circumstances, and '[i]n the absence of materially changed or clarified circumstances . . . courts should not condone a series of rearguments on the class issues[.]' [Citation.]" ' [Citation.] A 'class should be decertified "only where it is clear there exist changed circumstances making continued class treatment improper." ' " (*Espejo*, at p. 353, *Kight v. CashCall, Inc.*, at pp. 125-126.)

"A party moving for decertification generally has the burden to show that certification is no longer warranted, and courts have broad discretion in ruling on this issue. Trial courts ' " 'are ideally situated to evaluate the efficiencies and practicalities of permitting group action' " ' and therefore are ' " 'afforded great discretion' " ' in evaluating the relevant factors. [Citation.] However, '[d]ecertification resting on improper legal criteria or an incorrect assumption is an abuse of discretion. [Citation.] . . . We thus review only the reasons the court stated for its order, and we reverse if the reasons do not support [it].' " (*Kight v. CashCall, Inc.*, *supra*, 231 Cal.App.4th at p. 126.)

We afford the court's decision "great deference on appeal, reversing only for a manifest abuse of discretion." (*Noel v. Thrifty Payless, Inc., supra,* 7 Cal.5th at pp. 967-968.)

When a court reconsiders a class certification order, we likewise review the court's ruling for abuse of discretion. (See, e.g., *Simonyan v. Nationwide Insurance Company of America* (2022) 78 Cal.App.5th 889, 895; *New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 212.)

B. *Proposition 218*

*Plantier* reviewed the history of Proposition 218 and its procedural and substantive limitations. (*Plantier, supra,* 7 Cal.5th at pp. 380-382.) The voters approved Proposition 218 to address local governments' tendency to label certain special taxes as fees, charges or assessments so as to circumvent prior restrictions on the imposition of those taxes. (*Plantier,* at pp. 380-381.) In part, Proposition 218 added article XIII D to the California Constitution, addressing property-based taxes and fees. (*Id.* at p. 381.) The article imposes procedural prerequisites to imposing or increasing any fee or charge and also distinct substantive limitations on property-related fees. (*Ibid.*)

Under the substantive limitations contained in subdivision (b) of section 6, "(1) revenues derived from the fee may not exceed the cost of providing the property-related service ([art. XIII D], § 6, subd. (b)(1)); (2) those revenues may not be used for any purpose other than the one for which the fee was imposed (*id.,* § 6, subd. (b)(2)); (3) *the amount of the fee 'shall not exceed the proportional cost of the service attributable to the parcel'* (*id.,* § 6, subd. (b)(3), italics added); (4) a fee may not be imposed for a service unless that service is available to the property owner (*id.,* § 6, subd. (b)(4)); and (5) a fee may not be imposed upon property owners for a general governmental service, like fire protection, if the service is available to the general public in

22

substantially the same manner as it is to property owners (*id.*, § 6, subd. (b)(5))." (*Plantier*, 7 Cal.5th at p. 382.)

*Plantier* explained the distinction between the restrictions relevant here: the proportionality requirement of section 6(b)(3) and the cost-of-service requirement in section 6(b)(1). The proportionality requirement of section 6(b)(3) " 'ensures that the aggregate fee collected on all parcels is distributed among those parcels in proportion to the cost of service for each parcel.' " (*Plantier*, *supra*, 7 Cal.5th at p. 382, quoting *Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 908.) "The proportionality requirement concerns the *method* used to allocate a property-related service's aggregate cost among fee payors. It is separate from an agency's obligation not to collect more revenue than necessary to provide that service to all identified parcels [under section 6(b)(1)].)" (*Plantier*, at p. 382.) "[S]atisfying each subdivision is a different endeavor." (*Plata v. City of San Jose* (2022) 74 Cal.App.5th 736, 750.)

" 'The theme of [section 6(b)(1)] is that fee or charge revenues may not exceed what it costs to provide fee or charge services. Of course, what it costs to provide such services includes all the required costs of providing service, short-term and long-term, including operation, maintenance, financial, and capital expenditures. The key is that the revenues derived from the fee or charge are required to provide the service, and may be used only for the service. In short, the section 6(b)[(1)] fee or charge must reasonably represent the cost of providing service.' " (*Moore v. City of Lemon Grove* (2015) 237 Cal.App.4th 363, 368, quoting *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637, 647-648; see also *Wyatt v. City of Sacramento* (2021) 60 Cal.App.5th 373, 383.)

C. *Plaintiffs Do Not Allege a Violation of Section 6(b)(1)*

As stated, the trial court based its decertification order in part on a finding that plaintiffs could not advocate for class action propriety based on a claim of District's revenue overstatement in violation of section 6(b)(1) because they had not pleaded that theory in either their government claim or first amended complaint. The lower court's conclusion is consistent with the *Plantier* court's characterization of plaintiffs' operative complaint. After distinguishing the two restrictions of section 6(b)(1) and 6(b)(3), and having these plaintiffs' complaint before it, the *Plantier* court observed that their case was brought under section 6(b)(3)'s proportionality requirement: "Plaintiffs' complaint here is that the EDU assignment method does not properly allocate costs among parcels served." (*Plantier*, *supra*, 7 Cal.5th at p. 382.) We recognize that the question presented here was not before the *Plantier* court, but its observation is still compelling (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169 [even if dictum, courts should consider California Supreme Court statements persuasive]) and we agree with it. As we explain, even liberally construed, there are no allegations in plaintiffs' operative pleading that reasonably state a violation of section 6(b)(1).

Plaintiffs concede the first amended complaint does not mention section 6(b)(1). Indeed, that pleading generally describes the "nature of the action" (capitalization omitted) as one in which the District's EDU billing system "does not meet the requirements set forth in . . . [s]ection 6(b)(3)] . . . ." Plaintiffs nevertheless point to various allegations made both in their government claim and first amended complaint to suggest they adequately pleaded revenue overstatement in violation of section 6(b)(1). They say "the substantive allegations [of their government claim and first amended

24

complaint] relate directly to [section 6(b)(1)]—namely, that the sewer service charges exceed the funds required to provide the service." Plaintiffs further point to the liberal standards for permitting amendments of pleadings and maintain that given these standards and their allegations giving District notice of the "aggregate overcharge," the court's ruling cannot stand.

Plaintiffs' cited allegations, which we reproduce with our own emphasis, do not bear this out. The operative complaint's allegations are targeted to the lack of relationship between the charge and a property owner's water *use* or proportional cost of providing service *to a specific property*. It alleges District's EDU schedule is "arbitrary" and assigns EDU values "without regard to: (1) *the property's* actual wastewater *use*; and (2) the *proportional cost of providing that property* with wastewater service." (Italics added.) It alleges the EDU is not based on documentation "establishing a rational relationship between the EDU values set forth in the [s]chedule and actual wastewater *use* or *the proportional cost of providing a property with wastewater service*." (Italics added.) Plaintiffs repeatedly allege the service charge violates section 6(b)(3) for these reasons, i.e. because it is "imposed based solely on EDU[']s without regard to actual wastewater *use*, a property's *proportional burden* on the wastewater system, or the actual cost of providing *a property* with wastewater service." (Italics added.) The complaint alleges "[a] vacant property with little or no actual wastewater use is charged the same EDU-based use fee as an equivalent EDU-value property with significant wastewater use, despite the measurable difference in the *proportional cost* of providing *each property* with wastewater service." (Italics added.) It is true that plaintiffs allege District's "imposition of [the sewer service charge] has resulted in the systematic overcharge of [District's] wastewater customers," but that allegation comes immediately after one that

25

states the sewer charge "violates Proposition 218 because it is calculated on a per-EDU basis and bears *no rational relationship to a parcel's actual wastewater use.*" (Italics added.)

These are not allegations that the wastewater service fee revenues collected by District exceed *District's* operational, maintenance, financial, or capital costs or expenditures to provide the service. And because such allegations making out a section 6(b)(1) violation do not appear in plaintiffs' government claim, District was not on notice of the "basic factual underpinnings" (*Plata v. City of San Jose, supra*, 74 Cal.App.5th at p. 749, fn. 6) for such a claim. Accordingly, we do not address plaintiffs' arguments that they may amend their complaint, as they are precluded from asserting the theory at this late stage. (Accord, *Plata*, at pp. 747-752 [plaintiffs who did not mention "tiered rates" for water services or implicate section 6, subdivision (b)(3) in their government claim, pleadings or motion for class certification did not apprise the city defendant that they were attacking its tier structure, warranting reversal of the judgment on that claim].) "Clarity on such issues is especially critical in Proposition 218 cases because the Constitution places the burden on the government to show compliance with its requirements. The government cannot do this if claimants are not specific." (*Plata*, at p. 751.)

D. *The Court Did Not Abuse its Discretion in Granting Reconsideration and Decertifying the Class Based on Class Members' Conflicts of Interest*

Plaintiffs contend the court erred by decertifying the class "based on a speculative future conflict that does not, and cannot, exist." They maintain there is "no evidence of even one class member who underpaid their sewer service charges in the record," (emphasis omitted) nor is there evidence or law supporting a finding that a class member who previously underpaid could

26

be reassessed and forced to pay back-charges for prior years of service. Plaintiffs argue a potential future conflict, if it arises, is an issue that can be resolved later in the litigation, including by the court modifying the class definitions or withdrawing class status to a particular group. They further argue there is no evidence some class members may have to pay more in the future if the court finds a violation of Proposition 218; rather, according to plaintiffs, the evidence shows class-wide overcharges. Plaintiffs assert that even if District presented evidence that some ratepayers will pay more, the law—as discussed in *Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676 (*Capitol People First*)—will not put minority class member interests above the majority of class members' right to enforce Proposition 218.

Plaintiffs intersperse these arguments with assertions that District's zero-sum game position "necessarily depends on [District] collecting the proper amount for the total costs of annual sewer services" or that District's EDU values "have no rational relationship to the actual cost of providing any parcels with wastewater service . . . ." They argue elsewhere that District "is collecting far more than the amount necessary to rate and maintain the sewer system on an annual basis" such that the "entire class has been overcharged in an amount equal to a proportional cost of the service attributable to each parcel." We disregard these sorts of assertions for two reasons: They are based on the unpleaded theory that District's rates violate section 6(b)(1) because the total revenues exceed the funds required to provide the sewer services. They are also based on the declarations of Werner and DeMaster to which the court sustained objections and excluded from its consideration. Plaintiffs do not present meaningful argument or

27

authority challenging the court's evidentiary ruling to these declarations.[11] The theory under section 6(b)(1) cannot serve as a basis to maintain the class.

As stated, we are bound to review the court's reconsideration and decertification order for manifest abuse of discretion. (*Noel v. Thrifty Payless, Inc., supra*, 7 Cal.5th at pp. 967-968; *Simonyan v. Nationwide Insurance Company of America, supra*, 78 Cal.App.5th at p. 895.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1339.) Under this review standard, a court's ruling will not be disturbed unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Applying this standard on this record, we cannot say the court erred by decertifying the class. In 2015, District presented evidence to Judge Taylor via a declaration from its chief financial officer, Richard Hannasch, explaining why it was impossible for District to overcharge all of the class members, and why residential property owners/class members would suffer higher assessments on the success of commercial property-owner class members such as plaintiffs. Specifically, Hannasch stated "it is not mathematically possible that all customers (i.e., all prospective class

---

[11]     In a footnote included within their arguments concerning leave to amend the class definition or claims, plaintiffs say the court abused its discretion by "sustaining [District's] boilerplate, copied and pasted objections to every single piece of evidence introduced in opposition to the motion to decertify" without "provid[ing] any reason or bases for this ruling in the decertification order." Such cursory assertions do not constitute a meaningful evidentiary challenge, and we do not address them.

members) were overcharged, because all customers were paying their proportional share of a capped amount of revenues needed to provide sewer services. If any customers were overcharged, that would mean mathematically, inevitably, and necessarily, that other customers were undercharged. Each customer pays his or her share of the total costs of annual sewer services—if a determination is made about one customer's contribution, or one group of customers' contributions, it will necessarily affect the amount that the remaining customers will be required to contribute. Therefore, any refund of sewer service charges to certain customers would necessarily have to be paid out of funds collected from others." Pointing out all three plaintiffs owned commercial properties, Hannasch explained that "if commercial property owners successfully argued that they were overcharged for sewer service charges, the source of funds for any potential refunds would be higher assessments on other property owners, who are predominantly residential property owners."

Thus, District's opposition to certification in 2015 was premised in part on the theory that given its collection of a fixed amount of revenue, the lawsuit and any modification of the EDU schedule would give rise to antagonism and conflicts between the class representatives and the remaining class, or among class members. Judge Pollack determined, on reconsideration, that this evidence demonstrated Judge Taylor had erroneously certified a class with actual and inherent irreconcilable conflicts stemming from the lawsuit, pitting "the wins for some class members with the corresponding losses for others," which Judge Taylor did not appreciate. Judge Pollack further determined that because plaintiffs had not proposed a subclass that could eliminate such a conflict, nor had they provided an alternative methodology for calculating proportionate sewer charges, there

29

was no way to determine which members would get a reduced allocation under a modified methodology so as to proceed with a subclass.

It was not wholly unreasonable or outside the bounds of reason for Judge Pollack to view this evidence differently from Judge Taylor as showing a present and inherent, not hypothetical or speculative, conflict among class members sufficient to bar certification. Judge Pollack's observations are apt: "[S]ince the 'pie' from which proportionality must be allocated always totals 100 [percent], a 'zero[-]sum' game is created if any payer's proportionate share is changed. If one class member payer's proportion is reduced, necessarily other class member payor(s)' proportion(s) must increase. A lawsuit like this, premised upon 'robbing Peter to pay Paul' is inherently improper when Peter and Paul are both plaintiffs in the same lawsuit (and represented by the same law firm)." District was not required to provide evidence of underpaying class members when the very nature of the way District operates establishes the class will have antagonistic interests. It was not an abuse of discretion to conclude this sort of conflict among the proposed class members went "to the very subject matter of the litigation," namely the alleged overcharging of sewer system consumers. (See, e.g., *Global Minerals & Metals Corp.* (2003) 113 Cal.App.4th 836, 851-854 [plaintiffs who alleged defendants manipulated the price of copper, causing artificial inflation of prices, could not maintain class due to conflicts among plaintiff class members who acted as purchasers and those who acted as sellers, among other problems].) This is not merely a matter of class plaintiffs having to make individualized damages showings or eligibility for recovery. (Compare *In re Cipro Cases I & II* (2004) 121 Cal.App.4th 402, 414-415 [inflated prices were common to all plaintiffs, who were all harmed by the same anti-competitive conduct].)

District presented similar evidence in its decertification motion via the declarations of Handlers, Metts, and Schmollinger,[12] which went unrebutted when the court excluded plaintiffs' proffered expert evidence. While we agree with plaintiffs that these declarations were not new in addressing the zero-sum nature of District's EDU system, District buttressed its decertification motion with new evidence: deposition excerpts from class members who would withdraw or want to stop the lawsuit if it were to result in increased sewer charges. Plaintiffs appear to concede the class member deposition excerpts are new, but characterize them as "self-serving" and "cherry-picked." They maintain the court erred by considering the testimony, but provide no

---

[12] Handlers averred: "The calculation of sewer service charges is a zero-sum game. Even if this Court ordered the District to change its method for calculating rates, the District would still need to collect the same amount of revenues sufficient to operate and maintain the sewer system—the only thing that would change is the distribution of these costs among ratepayers. Assuming arguendo that Plaintiffs' theory was correct and the District's EDU method is unlawful (which it is not), if any customers were overcharged, that would mean, necessarily, that other customers were undercharged. Because of the way sewer service charges are calculated, customers who are allegedly overcharged would be, in a sense, subsidizing the sewer service costs for customers who are being undercharged. Customers who were undercharged would therefore actually benefit from the District's allegedly improper distribution formula. If the District's EDU schedule is modified for any occupancy type in a sewer service area, it will affect the calculated amount of sewer service charges that the remaining parcels in that sewer service will have to pay, because the amount of revenues needed remains the same, regardless of how those revenues are apportioned for collection." Metts made similar statements, explaining, "A decrease in one establishment type's sewer service charges (i.e., restaurants) could very well result in an increase for another's (i.e., residential)." Schmollinger, District's acting general manager and chief financial officer, discussed District's annual budget process used to determine total costs to maintain and operate the sewer system for the upcoming fiscal year, and the zero-sum game nature of the calculation of those services in a manner similar to Handlers.

reasoned legal argument with authority to support that position. On District's motion for decertification, it was not arbitrary or wholly unreasonable for the court to view this evidence as manifesting the antagonism to the class by class members situated similarly to the deponents.

Further, Judge Pollack relied on federal authority decided after Judge Taylor's class certification order—*Junod v. NWP Services Company* (C.D. Cal. 2016) 2016 WL 6306030—involving a similar context: claims of a billing servicer overcharging for water and sewer services. (*Id*. at *1.) In the absence of relevant state precedents on class action procedure, it is "well established" that California courts may take guidance from federal law. (*Green v. Obledo* (1981) 29 Cal.3d 126, 145-146; see also *Noel v. Thrifty Payless, Inc., supra,* 7 Cal.5th at p. 977; *Duran v. Obesity Research Institute, LLC* (2016) 1 Cal.App.5th 635, 646, fn. 6.)

The plaintiff in *Junod* sought to define a class of "[a]ll persons to whom [the billing servicer] sends invoices for utility services in the U.S. who have a water submeter in their unit that only measures hot water usage." (*Junod v. NWP Services Company, supra,* 2016 WL 6306030 at *2, 5.) The district court denied certification. The underlying legal theory supporting the claim was not pleaded in the complaint, but also the class was unidentifiable and unascertainable: it necessarily included unharmed members, that is, cold water users who ultimately paid less than their share of total water usage, whose utility costs the hot water users subsidized. (*Id*. at *5-6.) *Junod* explained that courts consistently denied certification when class definitions include both harmed and unharmed members. (*Id*. at *6, citing in part *Mazur v. eBay Inc.* (N.D. Cal. 2009) 257 F.R.D. 563, 567 [class included certain eBay auction purchasers who due to the type of bidding were not

32

harmed by an inflated price] & *Colapinto v. Esquire Deposition Servs., LLC* (C.D. Cal. 2011) 2011 WL 913251, at *4 [class was not ascertainable because definition included members who were reimbursed for allegedly unlawful and deceptive court reporter charges].)  Because the class in *Junod* fell within that category and was "imprecise and overbroad," the court denied certification.  (*Junod*, at *6.)

Such a defect in the class "alone is sufficient to warrant denial of plaintiff's motion for class certification."  (*Colapinto v. Esquire Deposition Servs., LLC*, *supra*, 2011 WL 913251 at *4, some capitalization omitted.) This court acknowledges that " ' "[c]lass certification is properly denied for lack of ascertainability when the proposed definition is overbroad and the plaintiff offers no means by which only those class member who have claims can be identified from those who should not be included in the class." ' " (*Hefczyc v. Rady Children's Hospital-San Diego* (2017) 17 Cal.App.5th 518, 537, disapproved on other grounds in *Noel v. Thrifty Payless, Inc.*, *supra*, 7 Cal.5th at p. 986, fn. 15 [disapproving *Hefczyc* to the extent it applied an ascertainability standard requiring class members be " 'readily identified without unreasonable expense or time by reference to official records' "].)  We cannot say the court abused its discretion in decertifying the class by applying *Junod v. NWP Services Company*, *supra*, 2016 WL 6306030 and like authorities.

Plaintiffs' cited cases involve differing facts that limit their persuasive value. (Accord, *Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1504 [" 'General expressions in opinions that go beyond the facts of the case will not necessarily control the outcome in a subsequent suit involving different facts' "].)  They do not compel a different conclusion in any event.  Plaintiffs compare the situation here with *Social Services Union, Local 535 etc. v.*

*County of Santa Clara* (9th Cir. 1979) 609 F.2d 944, in which the Ninth Circuit reversed a district court's denial of certification of a class of female union members paid less than their male counterparts based on the lower court's perception of a conflict between male and female class members' economic interests. (*Id*. at pp. 946, 948.) The Ninth Circuit explained the conflict was speculative: "While the court assumed that male union members would suffer pecuniary injury if the pay of female employees were raised relying on 'the general budgetary constraints on units of local government' this assumption is purely speculative. The record contains no evidence that the economic interests of male union members would in fact suffer in this or any other way because of relief that might be obtained in this action. Mere speculation as to conflicts that may develop at the remedy stage is insufficient to support denial of initial class certification." (*Id*. at p. 948.) Here, Judge Pollack was presented with nonspeculative evidence from District representatives as to the zero-sum nature of the District's EDU system, which he found *necessarily* created actual conflict among the class members; such unique circumstances were not present in *Social Services Union*.

Nor does *Capitol People First*, *supra*, 155 Cal.App.4th 676 assist plaintiffs. Plaintiffs rely on that case for the proposition that "the interests of minority class members cannot defeat the right of the majority of ratepayers to enforce Proposition 218." But *Capitol People First* is likewise inapposite. It involved the adequate representation of a class of persons with developmental disabilities who sought declaratory and injunctive relief related to their right to live in the least restrictive environment commensurate with their needs. (*Id*. at p. 681.) The class plaintiffs asserted the defendants' policies and practices did not comply with the law, but a

34

group of interveners—11 individuals and two nonprofit organizations—disagreed, taking the position that many members of the class would be best served in large institutions versus community settings. (*Id*. at pp. 698, 699.) The Court of Appeal reversed the lower court's decertification order, finding the intervenors' "concern goes to the merits of appellants' claim, not to the issue of certification"; that is, their "disagreement does not comprise antagonism that will defeat certification." (*Ibid*.) The appellate court went on to say: "Interveners have no legitimate interest in furthering any continuing violations of the law, or in preventing other class members from seeking systemic relief to correct any violations found by the court. Whether these laws have been violated is for the court to decide, with the help of interveners. As the court acknowledged, interveners can protect their interests by presenting evidence and making arguments to the trier of fact." (*Ibid*.) The court also observed that the plaintiffs and interveners had different philosophical perspectives, but those did not amount to legally cognizable antagonism where the interveners had materially misstated the plaintiffs' requested relief and position, leading the lower court to make erroneous assumptions about the "heart of this litigation." (*Id*. at pp. 699-700.) According to the court, "[d]ifferences among class members about the type of relief sought and the outcome of the litigation can be accommodated by the trial judge whose job is to give the various class interests the proper weight under the applicable substantive law." (*Id*. at p. 701.) The *Capitol People First* court emphasized that the subject matter of the case and the reforms plaintiffs sought were not about the actual outcomes of the placement determinations (*ibid*.), which was the intervenors' focus.

*Capitol People First*, *supra*, 155 Cal.App.4th 676 likewise does not involve circumstances where creating a broad class (here, of District

customers who paid a sewer service charge on or after November 22, 2012) pits some injured class members against others necessarily benefitted as to the very subject matter of the litigation. It does not involve a scenario of both harmed and unharmed class members, creating an unascertainable and improper class. The case does not compel us to conclude Judge Pollack abused his discretion in decertifying the class.

### IV. *Amicus Arguments*

Given our conclusion, we need not reach the arguments made by amicus California Association of Sanitation Agencies. Applying the framework set out in *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, it contends a refund is not an appropriate remedy for a constitutional Proposition 218 violation. But the issue was not raised by District in this court or below, and we will not consider it anew. " 'Courts generally do not consider new issues raised in amicus briefs. Instead, "[i]t is a general rule that an amicus curiae accepts a case as he or she finds it," and "[a]micus curiae may not 'launch out upon a juridical expedition of its own unrelated to the actual appellate record.' " [Citation.] "California courts refuse to consider arguments raised by amicus curiae when those arguments are not presented in the trial court, and are not urged by the parties on appeal. ' "Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curie will not be considered." ' " ' " (*People v. Davis* (2022) 75 Cal.App.5th 694, 725.) Further, courts should avoid resolving constitutional questions if the matter may be resolved on narrower grounds. (*Hassell v. Bird* (2018) 5 Cal.5th 522, 534; *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1102.)

## DISPOSITION

The order is affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

BUCHANAN, J.